Argued and submitted July 21, 2004, judgment of conviction and sentences of death affirmed; case remanded to circuit court for further proceedings March 17, 2005

# STATE OF OREGON,
*Respondent,*

*v.*

# ROBERT JAMES ACREMANT,
*Appellant.*

## (CC995133C1; SC S44772)

108 P3d 1139

Eric Johansen, Deputy Public Defender, Salem, argued the cause for appellant. With him on the appellant's brief was David E. Groom, Public Defender. With him on the appellant's supplemental brief was Peter A. Ozanne, Executive Director, Office of Public Defense Services. With him on the appellant's reply brief were Peter A. Ozanne, Executive Director, and Peter Gartlan, Chief Defender, Office of Public Defense Services.

Robert J. Acremant, *pro se*, Salem, filed the appellant's *pro se* second supplemental brief and reply brief.

Janet A. Metcalf, Assistant Attorney General, Salem, argued the cause for respondent. With her on the briefs were Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Kaye E. McDonald, Assistant Attorney General.

Before Carson, Chief Justice, and Gillette, Durham, Riggs, De Muniz, and Balmer, Justices.*

CARSON, C. J.

---

* Kistler, J., did not participate in the consideration or decision of this case.

## CARSON, C. J.

This case is before us on automatic and direct review of defendant's convictions for four counts of aggravated murder involving two victims and his sentences of death. *See former* ORS 163.150(1)(g) (1997), *repealed by* Or Laws 1999, ch 1055, § 1;[1] ORAP 12.10 (providing for such review). Defendant asks this court to reverse his convictions and sentences of death or, alternatively, to vacate his sentences of death and remand for resentencing. We affirm the judgment of conviction and the sentences of death. Because the trial court erred by entering more than one aggravated murder conviction for each victim, however, we remand the case for entry of a corrected judgment of conviction to reflect defendant's guilt as to the charge of aggravated murder for each victim based upon alternative aggravating factors.

### I. FACTS AND PROCEDURAL BACKGROUND

As discussed below, defendant pleaded guilty to four counts of aggravated murder for the deaths of two victims. The state introduced evidence of the following facts relating to those murders during defendant's subsequent penalty trial.

Defendant murdered Roxanna Ellis ("Ellis") and Michelle Abdill ("Abdill") in Medford, Oregon, on December 4, 1995. Before her death, Ellis had operated a property management company with her daughter, Lori Ellis ("Lori"). On the morning of December 4, Ellis left her office for an 11:00 a.m. appointment to show a residence on Sheraton Court in Medford. When Ellis later missed a 2:00 p.m. appointment scheduled for that day, Lori became concerned for her mother. Lori repeatedly paged and called Ellis on her cellular telephone but initially received no response. Eventually, at about 4:00 p.m. that afternoon, Ellis telephoned Lori and told Lori that she was doing some shopping. Lori testified that Ellis normally responded immediately to any page or telephone call from Lori and that Ellis was uncharacteristically quiet during their telephone conversation.

---

[1] This court's authority to review sentences of death now is provided under ORS 138.012(1).

When Lori asked Ellis why she had missed her 2:00 p.m. appointment, Ellis responded that she must have had the wrong address. When Lori asked Ellis why she had not answered Lori's pages and telephone calls, Ellis responded that all the telephone circuits must have been busy.

Abdill was Ellis's domestic partner. At about 4:30 p.m. on December 4, Abdill received a telephone call at her workplace. After she got off the telephone, Abdill informed a coworker that Ellis had a problem with her vehicle and that Abdill was leaving to help her. Abdill also left a message on Lori's telephone answering machine, stating that she was going to help Ellis with a dead battery and that she would call Lori back to let her know what was happening.

Later that night, after she did not hear from either Ellis or Abdill again, Lori drove to the Sheraton Court residence where Ellis had had her 11:00 a.m. appointment. When she turned on to Sheraton Court, Lori saw Ellis's pickup truck driving away. Lori attempted to follow the truck and to get the driver's attention by honking and flashing her lights, but the driver did not stop and eventually eluded her. After she lost sight of the truck, Lori stopped at a service station and called Abdill's mother to tell her that "something was wrong." Lori then returned to the Sheraton Court residence, where she met with Dan Abdill ("Dan"), Abdill's brother. After finding Abdill's unlocked vehicle parked in front of that residence with Abdill's purse in plain view, Lori and Dan contacted the police.

During their subsequent investigation of the disappearance of Ellis and Abdill, the police interviewed two neighbors of the Sheraton Court residence, Toni Newman ("Newman") and her then-14-year-old son Chris Newman ("Chris"), who also were tenants of Ellis. Chris reported that, on the afternoon of December 4, he had seen Ellis's truck parked in front of the Sheraton Court residence and then, later that evening, backed into the garage of that residence. Chris also reported that, on that same afternoon, he had spoken with a man—whom he identified during the penalty trial as defendant—in the driveway of the Sheraton Court residence. Chris reported that the man had told Chris that he was going to be Chris's new neighbor and that he was moving a few

things. Newman also reported that, when she returned home from work on the evening of December 4, she had seen a man in front of the Sheraton Court residence. BothNewman and Chris described the man whom they had seen in front of the Sheraton Court residence to a police sketch artist.

On December 7, 1995, Ellis's truck was located in a parking lot in Medford. The bodies of Ellis and Abdill were discovered in the bed of the truck, wrapped in drapes and covered by cardboard boxes and an assortment of other things. The bodies of both women had been bound with duct tape, and both women had been shot twice in the head. A witness, Van Duser, reported to the police that, on the evening of December 4, he had seen and spoken with a man—whom he identified during the penalty trial as defendant—who had parked Ellis's truck in that parking lot and then walked away. Van Duser also described the man whom he had seen in the parking lot to a police sketch artist.

On December 10, 1995, defendant's mother, Bradshaw, contacted the police to report her fear that defendant might be responsible for the murders of Ellis and Abdill based upon defendant's behavior on the day of their disappearance and his resemblance to the composite sketch that the police had publicized of the suspect in the case. Bradshaw informed the police that she recently had moved from California to Medford with defendant and that, when they first had arrived in Medford, Ellis had taken them to view the residence on Sheraton Court. During that interview, Bradshaw showed the police cardboard boxes that she had used during her move to Medford. The police recognized address labels on those boxes as matching address labels found on boxes covering the victims' bodies in Ellis's truck.

That same day, the police interviewed defendant's brother, Kenneth Acremant, Jr. ("Kenneth Jr."), who also resided in Medford. Kenneth Jr. reported that, before the disappearance of Ellis and Abdill, defendant had made a telephone call from Kenneth Jr.'s workplace, the "Tiki Lodge." A caller identification device on Ellis's telephone showed that Ellis had received a telephone call from the "Tiki Lodge."

Subsequently, after obtaining a copy of defendant's fingerprints from the California Department of Justice, the

police identified fingerprints found on the duct tape wrapping the victims' bodies as belonging to defendant. The police also identified fingerprints found inside the Sheraton Court residence as belonging to defendant. In addition, the police determined that a footprint found on the bumper of Ellis's truck was consistent with tennis shoes that belonged to defendant.

At approximately 4:15 a.m. on December 13, 1995, defendant was arrested in Stockton, California. Pursuant to a warrant, the police searched the motel room where they had found and arrested defendant. During that search, the police discovered a .25 caliber gun that later proved to be the weapon used in the murders of Ellis and Abdill. The police also found a homemade silencer device covered with DNA material that later proved to be consistent with being a mixture of DNA material from both Ellis and Abdill.

Subsequently to his arrest, defendant made several statements to the police in which he confessed to the murders of Ellis and Abdill, as well as confessed to the unrelated murder of a man, Scott George ("George"), in Visalia, California. In his statements about the Ellis and Abdill murders, defendant told the police that, on the morning of December 4, 1995, he had used the telephone at the Tiki Lodge to set up an 11:00 a.m. appointment with Ellis to view the residence on Sheraton Court as part of a robbery plan. Defendant reported that he had targeted Ellis because he had thought that her position as a property manager would give her access to large sums of cash. When Ellis met defendant at the Sheraton Court residence, defendant handcuffed her and took her purse, but came to realize over the course of the day that Ellis lacked means to make immediate withdrawals of cash from either her credit cards or from the bank accounts of the property management company. Eventually, defendant allowed Ellis to telephone her daughter to explain her absence from the office. In an effort to salvage his robbery plan, defendant also directed Ellis to telephone Abdill and to ask Abdill to come to the Sheraton Court residence. After Abdill arrived, defendant tied up and gagged both women. Later that evening, he forced Ellis and Abdill to climb into the back of Ellis's truck. Defendant subsequently shot both women twice, drove them to the parking lot where their bodies later were discovered, and then covered their bodies with materials that he

found in Ellis's truck. The next morning, defendant returned to the parking lot and covered the victims' bodies with additional cardboard boxes that he had brought.

After his arrest, the state extradited defendant from California to Oregon. For his crimes against Ellis and Abdill, the state charged defendant with four counts of aggravated murder, ORS 163.095(1)(d) and ORS 163.095(2)(d) (counts one to four of the indictment);[2] two counts of first-degree kidnaping, ORS 163.235(1)(c) (counts five and six);[3] and one count of first-degree robbery, ORS 164.415(1)(a) (count seven).[4]

On September 11, 1996, defendant pleaded guilty to all the charged offenses, and the trial court sentenced defendant on the noncapital crimes. Beginning on September 23,

---

[2] ORS 163.095 provides, in part:

"As used in ORS 163.105 and this section, 'aggravated murder' means murder as defined in ORS 163.115 which is committed under, or accompanied by, any of the following circumstances:

"(1)(a) * * *

"(d) There was more than one murder victim in the same criminal episode as defined in ORS 131.505.

"* * * * *

"(2)(a) * * *

"(d) Notwithstanding ORS 163.115(1)(b), the defendant personally and intentionally committed the homicide under the circumstances set forth in ORS 163.115(1)(b)."

ORS 163.115(1) provides, in part:

"(b) When it is committed by a person, acting either alone or with one or more persons, who commits or attempts to commit any of the following crimes and in the course of and in furtherance of the crime the person is committing or attempting to commit, or during the immediate flight therefrom, the person, or another participant if there be any, causes the death of a person other than one of the participants:

"* * * * *

"(G) Robbery in the first degree as defined in ORS 164.415[.]"

[3] ORS 163.235(1) provides, in part:

"A person commits the crime of kidnapping in the first degree if the person violates ORS 163.225 with any of the following purposes:

"* * * * *

"(c) To cause physical injury to the victim[.]"

[4] ORS 164.415(1) provides, in part:

"A person commits the crime of robbery in the first degree if the person violates ORS 164.395 and the person:

"(a) Is armed with a deadly weapon[.]"

1997, the trial court conducted a separate penalty trial to allow a jury to determine defendant's sentences for the aggravated murder convictions. On October 27, 1997, the jury unanimously concluded as to both murders that defendant had acted deliberately, that he posed a continuing risk to society, and that he should receive a death sentence.[5] The trial court accordingly sentenced defendant to death for each murder. *See* ORS 163.150(1)(f) (trial court shall sentence defendant to death if jury affirmatively answers each issue under ORS 163.150(1)(b)). This court's automatic and direct review of defendant's judgment of convictions and sentences of death followed.

## II. ASSIGNMENTS OF ERROR

On review before this court, defendant raises 25 assignments of error.[6] We have reviewed all those assignments of error and conclude that, except for one relating to the entry of multiple aggravated murder convictions for each victim, none is well taken. A number of defendant's assignments of error have been answered in other decisions

---

[5] In a death-penalty sentencing proceeding, ORS 163.150(1)(b) requires that a jury unanimously answer the following four questions in the affirmative:

"(A) Whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that death of the deceased or another would result;

"(B) Whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society;

"(C) If raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased; and

"(D) Whether the defendant should receive a death sentence."

The jury considers the third question set out in ORS 163.150(1)(b)(C), regarding provocation by the victim, only when that question is relevant under the facts of the case. *See, e.g., State v. Terry*, 333 Or 163, 182-83 n 12, 37 P3d 157 (2001), *cert den*, 536 US 910 (2002) (question set out in ORS 163.150(1)(b)(C) not submitted to jury). In this case, the jury did not consider the question set out in ORS 163.150(1)(b)(C) as to either victim.

[6] Defendant's counsel raised 24 of those assignments of error. With this court's permission, defendant filed a supplemental *pro se* brief raising an additional assignment of error. Defendant also filed a *pro se* "Motion to Vacate Judgments and Reverse Convictions." This court construed that motion to be another *pro se* supplemental brief.

by this court, are moot, or otherwise do not merit further discussion.[7] We address defendant's remaining assignments of error below in the order that he presented them.

A. *Application of ORS 163.150(1)(c)(B) (1997) to Defendant's Penalty Trial*

■ Before the start of his penalty trial and again before the trial court instructed the jury, defendant objected to the application of the statutory jury instruction in ORS 163.150(1)(c)(B) (1997) to his penalty trial, because he had committed his crimes before its effective date. *See* Or Laws 1997, ch 784, § 1 (effective date of Oct 4, 1997). That statutory provision, set out *post*, requires the trial court to instruct the jury to consider any aggravating evidence and any victim-impact evidence, along with any mitigating evidence, in answering the question set out in ORS 163.150(1)(b)(D). The trial court overruled defendant's objections and instructed the jury pursuant to ORS 163.150(1)(c)(B) (1997).

In two assignments of error, defendant contends that the application of ORS 163.150(1)(c)(B) (1997) to his penalty trial violated the prohibitions against *ex post facto* laws contained in Article I, section 21, of the Oregon Constitution and Article I, section 10, of the United States Constitution.[8] This court previously resolved defendant's state and federal constitutional arguments relating to the

---

[7] In addition to the assignments of error that this court previously has answered and the assignments of error discussed below, defendant assigns error to a number of rulings that the trial court made during his penalty trial, including: (1) the trial court's denial of his challenge to the composition of the jury pool; (2) the trial court's denial of his motion for change of venue; (3) the trial court's admission of four photographs of the victims after their deaths; (4) the trial court's failure to declare a mistrial *sua sponte* in response to statements regarding defendant's failure to express remorse in the prosecutor's opening and closing arguments; (5) the trial court's denial of defendant's motion *in limine* to prohibit the prosecutor from making statements regarding defendant's failure to express remorse; and (6) the trial court's failure to grant defendant's motion for a mistrial in response to the prosecutor's questioning of Janis Lindsey, defendant's aunt, about defendant's failure to express remorse for the murders. We have examined each of those rulings and conclude that the trial court did not err. Further discussion of those assignments of error would not benefit the public, the bench, or the bar.

[8] Article I, section 21, of the Oregon Constitution provides, in part, that "[n]o *ex-post facto* law * * * shall ever be passed * * *." Article I, section 10, of the United States Constitution similarly provides, in part, that "[n]o State shall * * * pass any * * * ex post facto Law * * *."

retroactive application of the victim-impact evidence provision of ORS 163.150(1)(c)(B) (1997) in the state's favor in *State v. Guzek*, 336 Or 424, 86 P3d 1106 (2004) (*Guzek III*). As explained below, in this case, we further reject defendant's constitutional arguments relating to the aggravating evidence provision of ORS 163.150(1)(c)(B) (1997), because the 1997 amendment to that statutory jury instruction did not alter the evidence admissible in an Oregon death-penalty sentencing proceeding.

Before turning to defendant's arguments, we first provide background relating to the statutory framework at issue. ORS 163.150(1)(c)(B) (1997) is the statutory jury instruction that accompanies the question set out in ORS 163.150(1)(b)(D), that is, "[w]hether the defendant should receive a death sentence." The question set out in ORS 163.150(1)(b)(D) was added to the Oregon death-penalty sentencing statute in 1989 and was amended to its current wording in 1991. Or Laws 1989, ch 790, § 135b; Or Laws 1991, ch 885, § 2.[9] Unlike the three other statutory questions under ORS 163.150(1)(b), ORS 163.150(1)(b)(D) frames a discretionary determination for the jury and is not subject to any burden of proof. *See State v. Fanus*, 336 Or 63, 70, 79 P3d 847 (2003), *cert den*, 541 US 1075, 124 S Ct 2416, 158 L Ed 2d 987 (2004) (noting same).

Although a version of ORS 163.150(1)(b)(D) has been part of the Oregon death-penalty sentencing statute since 1989, the evidence relevant to the jury's consideration of that question has changed in recent years. In construing the 1989 version of the sentencing statute, a majority of this court concluded that the question set out in ORS 163.150(1)(b)(D) operated solely as a mechanism for the jury to consider mitigating circumstances in deciding whether a defendant should be sentenced to death. *See State v. Guzek*, 322 Or 245, 263,

---

[9] ORS 163.150(1)(b)(D) (1989) provided:

"If constitutionally required, considering the extent to which the defendant's character and background, and the circumstances of the offense may reduce the defendant's moral culpability or blameworthiness for the crime, whether a sentence of death be imposed."

The 1991 Legislative Assembly amended ORS 163.150(1)(b)(D) to its current wording in response to this court's decision in *State v. Wagner*, 309 Or 5, 786 P2d 93, *cert den*, 498 US 879 (1990).

906 P2d 272 (1995) (so holding as to ORS 163.150(1)(b)(D) (1989)) (*Guzek II*). Based upon that conclusion, this court held that only evidence relating to the existence of mitigating circumstances was relevant to the jury's determination under ORS 163.150(1)(b)(D) (1989). *Id.*

In 1995, however, the legislature amended ORS 163.150(1)(a) to provide explicitly that, in addition to evidence relating to mitigating circumstances, victim-impact evidence and aggravating evidence also may be relevant to the jury's determination of the question under ORS 163.150(1)(b)(D). *See Fanus*, 336 Or at 70 (noting same). ORS 163.150(1)(a) (1995) provided, in part:

> "In the [aggravated murder sentencing] proceeding, evidence may be presented as to any matter that the court deems relevant to sentence *including, but not limited to, victim impact evidence relating to the personal characteristics of the victim or the impact of the crime on the victim's family and any aggravating and mitigating evidence relevant to the issue in paragraph (b)(D) of this subsection*[.]"

Or Laws 1995, ch 531, § 2 (emphasis added).[10] Defendant here committed his crimes in December 1995, after the effective date of that 1995 amendment to ORS 163.150(1)(a). *See* Or Laws 1995, ch 531, § 2 (effective date of July 7, 1995).

At the time when the 1995 Legislative Assembly amended ORS 163.150(1)(a), the jury instruction set out in ORS 163.150(1)(c)(B) did not direct the jury to consider either victim-impact evidence or aggravating evidence in answering ORS 163.150(1)(b)(D). Instead, ORS 163.150(1)(c)(B) (1995) provided:

> "In determining [whether the defendant should receive a death sentence], the court shall instruct the jury to answer the question 'no' if one or more of the jurors find there is any aspect of the defendant's character or background, or any circumstances of the offense, that one or more of the jurors believe would justify a sentence less than death."

---

[10] Prior to the 1995 amendment to ORS 163.150(1)(a), that statute provided, in part, that, "[i]n the [aggravated murder sentencing] proceeding, evidence may be presented as to any matter that the court deems relevant to sentence[.]" ORS 163.150(1)(a) (1993).

Subsequently, however, the 1997 Legislative Assembly amended the jury instruction in ORS 163.150(1)(c)(B) to reflect the 1995 changes to ORS 163.150(1)(a) respecting the admissibility of victim-impact evidence and aggravating evidence relevant to the jury's determination under ORS 163.150(1)(b)(D). ORS 163.150(1)(c)(B) (1997) provided:

> "The court shall instruct the jury to answer the question in paragraph (b)(D) of this subsection 'no' if, after considering *any aggravating evidence and any mitigating evidence concerning any aspect of the defendant's character or background, or any circumstances of the offense and any victim impact evidence as described in subsection (1)(a) of this section,* one or more of the jurors believe that the defendant should not receive a death sentence."

Or Laws 1997, ch 784, § 1 (emphasis added). Over defendant's objections, the trial court instructed the jury in defendant's penalty trial pursuant to ORS 163.150(1)(c)(B) (1997), notwithstanding the fact that that statutory provision became effective after defendant had committed his crimes.

With that background in mind, we turn to the merits of defendant's arguments. As briefly noted above, 338 Or at 311-12, this court previously has held that retroactive application of the victim-impact provisions of *both* ORS 163.150(1)(a) (1995) *and* ORS 163.150(1)(c)(B) (1997) is not prohibited by either the state or the federal constitutions. *See Guzek III,* 336 Or at 439-47 (so holding).[11] We therefore

---

[11] In addition to his *ex post facto* challenges, defendant raises four other assignments of error relating to the admission of victim-impact evidence under ORS 163.150(1)(a) (1995) and ORS 163.150(1)(c)(B) (1997) during his penalty trial. In two of those assignments of error, defendant raises numerous facial constitutional challenges to ORS 163.150(1)(a) (1995) and ORS 163.150(1)(c)(B) (1997), and also argues that the victim-impact testimony of Lori Ellis and Karen Brown (the sister of Abdill) was irrelevant under OEC 401 and was unfairly prejudicial under both OEC 403 and the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *See Payne v. Tennessee,* 501 US 808, 825, 111 S Ct 2597, 115 L Ed 2d 720 (1991) (although Eighth Amendment does not prohibit admission of victim-impact evidence, Due Process Clause protects against admission of victim-impact evidence "so unduly prejudicial that it renders the trial fundamentally unfair"). Defendant's facial constitutional arguments raised in those assignments of error either have been rejected in other decisions by this court or are not well taken. Defendant's challenges to the victim-impact testimony of Lori Ellis and Karen Brown also are not well taken.

In another assignment of error, defendant argues that the trial court erred by denying his motion *in limine* to exclude victim-impact testimony from Art George and Wendy Riley (respectively, the father and the sister of Scott George) during his

consider below only defendant's constitutional challenges to the application of the aggravating evidence provision of ORS 163.150(1)(c)(B) (1997).

In *Guzek III*, this court observed that both the state and federal constitutions prohibit application of laws fitting within the "fourth category" of laws that Justice Chase had described in his opinion in *Calder v. Bull*, 3 US (3 Dall) 386, 390-91, 1 L Ed 648 (1798)—that is, " '[e]very law that alters the legal rules of evidence, and receives less, or different testimony, than the law required at the time of the commission of the offen[s]e, in order to convict the offender.' " *Guzek III*, 336 Or at 434, 445. Despite that shared acceptance of *Calder*, however, this court has interpreted the Oregon Constitution as prohibiting a broader range of evidentiary changes than the United States Supreme Court had delineated for purposes of the United States Constitution. Specifically, this court has identified evidentiary changes triggering the state constitutional prohibition against *ex post facto* laws as including any "laws that alter the rules of evidence in a one-sided way that makes the conviction of the defendant more likely." *Id.* at 435 (quoting *State v. Fugate*, 332 Or 195, 213, 26 P3d 802 (2001) (internal quotation marks omitted)). By contrast, the Supreme Court has identified evidentiary changes triggering the federal constitutional prohibition against *ex post facto* laws as including only evidentiary changes that "alter[ ] the sufficiency-of-evidence standard or otherwise 'reduc[e] the quantum of evidence necessary to meet the burden of proof' to convict." *Id.* at 445-46 (quoting *Carmell v. Texas*, 529 US 513, 532-33, 120 S Ct 1620, 146 L Ed 2d 577 (2000)). Finally, because it is analogous to a guilt-phase criminal trial, the court in *Guzek III* determined that both the state and the federal constitutional protections

___

penalty trial. That assignment of error is moot, however, because the state ultimately did not introduce victim-impact testimony from either of those witnesses during the penalty trial.

Finally, in the last of those assignments of error, defendant argues that the trial court erred by denying his motion for a mistrial based upon the victim-impact testimony of Karen Brown. We have reviewed that testimony and conclude that the trial court did not abuse its discretion in denying defendant's motion. *See State v. Farrar*, 309 Or 132, 164, 786 P2d 161, *cert den*, 498 US 879 (1990) (denial of motion for mistrial reviewed for abuse of discretion). Further discussion of the above-described assignments of error would not benefit the public, the bench, or the bar.

against such evidentiary changes extend to a death-penalty sentencing proceeding. *Id.* at 436, 436 n 11.

In this case, defendant contends that, by instructing the jury to consider aggravating evidence in answering ORS 163.150(1)(b)(D), the 1997 amendment to ORS 163.150(1)(c)(B) altered the rules of evidence in a one-sided way that made the imposition of a death sentence more likely. In *Guzek III*, this court held that Article I, section 21, of the Oregon Constitution prohibited the retrospective application of the "any aggravating evidence" provisions of *both* ORS 163.150(1)(a) (1995) *and* ORS 163.150(1)(c)(B) (1997) to the defendant's penalty trial for aggravated murders committed in June 1987. In reaching that conclusion, this court explained that, because the state previously had been limited to introducing only aggravating evidence relevant to the first three statutory questions under ORS 163.150(1)(b), ORS 163.150(1)(a) (1995) and ORS 163.150(1)(c)(B) (1997) expanded the scope of aggravating evidence admissible in a death-penalty sentencing proceeding by purportedly authorizing the state also to introduce aggravating evidence specifically relevant to ORS 163.150(1)(b)(D). Because such a change in the law benefits only the state, this court unanimously concluded that it "undoubtedly qualifies as a 'one-sided' change that makes the imposition of a sentence of death more likely[.]" *Id.* at 438.

By contrast to the defendant in *Guzek III*, however, defendant here committed his crimes *after* the effective date of the 1995 amendment to ORS 163.150(1)(a). Thus, at the time when defendant committed his crimes, the legislature already had modified the sentencing statute to provide for the introduction of aggravating evidence relevant to ORS 163.150(1)(b)(D). Contrary to defendant's assertions, nothing about the 1997 amendment to the jury instruction in ORS 163.150(1)(c)(B) either expanded the scope of aggravating evidence, or diminished the scope of the mitigating evidence, admissible under ORS 163.150(1)(b)(D). Although it is true that ORS 163.150(1)(c)(B) (1995) did not require the trial court to instruct the jury to consider aggravating evidence in deciding ORS 163.150(1)(b)(D), such an instruction would not have been impermissible at the time that defendant had

committed his crimes. That is so because the 1997 amendment to the jury instruction in ORS 163.150(1)(c)(B) merely conformed that jury instruction to the evidentiary change that the 1995 Legislative Assembly already had made. *See* ORCP 59 B ("In charging the jury, the court shall state to them all matters of law necessary for their information in giving their verdict."); *see also* ORS 136.330(1) (ORCP 59 B applies to criminal trials). In short, defendant's state and federal *ex post facto* arguments lack merit, because the 1997 amendment to ORS 163.150(1)(c)(B) did not alter the evidence admissible in an Oregon death-penalty sentencing proceeding so as to make imposition of a death sentence more likely or so as to reduce the quantum of proof necessary to impose such a sentence. The trial court therefore did not err in instructing the jury pursuant to ORS 163.150(1)(c)(B) (1997).[12]

B. *Motion to Suppress Statements to Police Following Arrest*

Before the start of his penalty trial, defendant moved to suppress inculpatory statements that he had made in response to police questioning on the day of his arrest. The trial court denied defendant's motion, and defendant assigns error to that ruling.

The following undisputed facts relating to defendant's assignment of error are taken from the trial court's findings of fact and from the record. *See State v. Stevens*, 311 Or 119, 135, 806 P2d 92 (1991) (this court is bound by trial court's findings of historical fact if constitutionally sufficient evidence in record supports them). As noted previously, 338 Or at 308, defendant was arrested in Stockton, California, at approximately 4:15 a.m. on December 13, 1995. After his

---

[12] Defendant also asserts, without elaboration, that the application of ORS 163.150(1)(c)(B) (1997) to his penalty trial violated his due process rights under the Fourteenth Amendment to the United States Constitution, his rights to counsel under Article I, section 11, of the Oregon Constitution and the Sixth Amendment, his right to be free from cruel and unusual punishment under the Eighth Amendment, and his rights under the privileges and immunities clause of Article I, section 20, of the Oregon Constitution and the Equal Protection Clause of the Fourteenth Amendment. In view of defendant's failure to develop arguments in support of those assertions, we reject them without further discussion. *See State v. Montez*, 309 Or 564, 604, 789 P2d 1352 (1990) (taking same approach in analogous circumstances).

arrest, defendant was transported to a station house of the Stockton Police Department, where he was placed alone in an interview room and was fed breakfast. At approximately 7:30 a.m. that same morning, Medford Police Detectives Newell and Skinner met with defendant. Defendant was not handcuffed. At the outset of the interview, the detectives identified themselves and informed defendant that their interview with him was being recorded. The detectives also read defendant standard *Miranda* warnings[13] and confirmed that defendant understood the rights that those warnings described.

After initially speaking with the detectives for a short time, defendant stated, "I think that I do need a lawyer. I do." The detectives responded to that statement by informing defendant that the interview would end if defendant wished to see a lawyer. The detectives then continued to speak with defendant for approximately 13 more minutes. During that time, the detectives stated that they were "disappointed" that defendant had elected to terminate the interview, that they were interested in hearing defendant's side of the story, and that they were curious about defendant's motive for the murders. They also discussed the extradition process with defendant and informed him that he would have the opportunity to see a judge that same day. In response to those statements, defendant asked the detectives about their theory of the motive for the crimes, as well as asked whether any arrest warrants had issued for him in California. Finally, before leaving the interview room, Newell stated:

---

[13] In *Miranda v. Arizona*, 384 US 436, 86 S Ct 1602, 16 L Ed 2d 694 (1966), the Supreme Court held that a criminal defendant must be advised of his or her right against compelled self-incrimination and the derivative right to counsel under the Fifth Amendment to the United States Constitution as a prerequisite to a custodial interrogation. Subsequent to that decision, this court similarly required governmental officials to inform a criminal defendant of those same rights in a custodial interrogation as a procedural mechanism to protect a defendant's rights under Article I, section 12, of the Oregon Constitution. *State v. Magee*, 304 Or 261, 744 P2d 250 (1987) (concluding that Article I, section 12, is independent source of requirement for warnings like those required under *Miranda*); *see also State v. Sparklin*, 296 Or 85, 88-89, 672 P2d 1182 (1983) (if required by Oregon Constitution, warnings like those required under *Miranda* sufficient to satisfy Article I, section 12). For ease of reading, when we refer to those warnings relating to both the Fifth Amendment and Article I, section 12, we refer to them simply as *"Miranda* warnings."

"We're going to be here a few days. Uhm, we're doing search warrants and we're conducting interviews so, and I'm telling you this just for information. Uhm, if you change your mind and would like to talk to us, you can do so. All you need to do is contact the jail staff and say get a hold of Stockton detectives immediately. I want to talk to Medford detectives and these guys here will know how to get in touch with us. We spent last night in Visalia. Uhm, we will probably spend the night here I'm guessing.

"* * * * *

"Yeah, we're out of here. Wish you luck, bud. I think we'll be seeing you again, all right."

Shortly after the detectives exited the interview room, another police officer entered the room, handcuffed defendant, and then left him alone again. Approximately one hour later, defendant knocked on the door to the interview room and requested to speak with the Medford detectives.

In response to defendant's request, two different detectives, Medford Police Detectives George and Doney, met with defendant. At the outset of that interview, those detectives identified themselves and removed defendant's handcuffs. Those detectives also reminded defendant that the interview with him was being recorded and again read him standard *Miranda* warnings. Defendant subsequently made inculpatory statements relating to both the Ellis and Abdill murders and to the George murder.

As noted above, before the start of the penalty trial, defendant moved to suppress the statements that he had made during the interview with George and Doney on the day of his arrest, as well as any evidence that had derived from those statements. He argued that suppression was required under both the state and federal constitutions because the police had failed to cease all questioning after he had requested a lawyer and because his statements to George and Doney had been involuntary. Following a hearing, the trial court denied defendant's motion, stating:

"I am of the view that [defendant] did invoke his right to counsel. The law directs when that is done that all questioning cease. That did not occur precisely in this case. There was some conversation that took place after that[,]

that is an irregularity. They could have done more as far as affording him an opportunity to contact an attorney. That also is an irregularity.

"I further find that [defendant] did on his own, quite apart from any law enforcement officers, reinitiate contact and ask to talk with the police officers. There [were] two different officers that [*sic*] than the two that he originally talked with. The two original ones were Newell and Skinner, and the other two were Officer Doney and Officer Tim George.

"The question posed to the Court, as I see it, is whether or not the irregularities enumerated were so egregious that the law should not recognize [defendant's] reinitiation of contact, and I am going to find that there were irregularities, but they were not so egregious that the law should not allow recontact, so the recontact was appropriate and was done voluntarily on the part of [defendant], and there were two other considerations.

"I did closely scrutinize what was said, and what [defendant] said to the police officers during the time after he asked for a lawyer was not any incriminating statement. In other words, he didn't let any cat out of the bag. He was not psychologically overcome. I don't think that he was in a position where he could as a reasonable person say 'Well, I've already told them[,] so what's the use of not talking?' So there was no psychological overburden, and he didn't make any disclosures that were so serious that he felt he had already told them what they wanted to know. That is a pivotal consideration, in the Court's view, and it is for those reasons that I'll deny the Motion to Suppress in its entirety."

Before this court, defendant asserts that the trial court erred by denying his motion to suppress his statements. Defendant contends that the admission of those statements during his penalty trial was contrary to ORS 163.150(1)(a)[14] and violated his right against compelled self-incrimination and the derivative right to counsel under Article I, section 12, of the Oregon Constitution and the Fifth Amendment to the United States Constitution,[15] and his due process rights

---

[14] ORS 163.150(1)(a) provides, in part, that "[t]his subsection shall not be construed to authorize the introduction of any evidence secured in violation of the Constitution of the United States or of the State of Oregon[.]"

[15] Article I, section 12, provides, in part, that "[n]o person shall be * * * compelled in any criminal prosecution to testify against himself." The Fifth Amendment

under the Fourteenth Amendment.[16] For the reasons explained below, we reject defendant's arguments.[17]

1. *Validity of Defendant's Waiver of Right to Have Counsel Present at Custodial Interrogation*

We first consider whether defendant made a valid waiver of his right to counsel under Article I, section 12, and the Fifth Amendment at the time when he made the challenged statements to George and Doney. To be valid under both the state and federal constitutions, a waiver of the right to counsel must be knowing, intelligent, and voluntary under the totality of the circumstances. *State v. Joslin*, 332 Or 373, 386, 29 P3d 1112 (2001) (Article I, section 12); *Edwards v. Arizona*, 451 US 477, 482, 101 S Ct 1880, 68 L Ed 2d 378 (1981) (Fifth Amendment). Although we are bound by its findings of historical fact, we review a trial court's conclusions regarding a defendant's waiver of the right to counsel for legal error. *State v. Montez*, 309 Or 564, 571-73, 789 P2d 1352 (1990).

Consistently with our usual practice, we begin by considering defendant's arguments under the Oregon Constitution. *See State v. Kennedy*, 295 Or 260, 262, 666 P2d 1316 (1983) (court considers all questions of state law before reaching federal constitutional claims). This court previously has held that, when a suspect in custody unequivocally asserts his or her right to counsel, then the police must cease further questioning and grant the suspect's request for a lawyer. *State v. Kell*, 303 Or 89, 95-100, 734 P2d 334 (1987). As explained in *Montez*, this court adopted that rule to "protect a

---

similarly provides, in part, that "[n]o person * * * shall be compelled in any criminal case to be a witness against himself[.]" The Fifth Amendment privilege against compelled self-incrimination is made applicable to the states through the Due Process Clause of the Fourteenth Amendment. *Malloy v. Hogan*, 378 US 1, 8, 84 S Ct 1489, 12 L Ed 2d 653 (1964).

[16] The Fourteenth Amendment provides, in part, that "[n]o State shall * * * deprive any person of life, liberty, or property, without due process of law[.]"

[17] Defendant also asserts that the police obtained his statements in violation of his right to counsel under Article I, section 11, of the Oregon Constitution and the Sixth Amendment to the United States Constitution. Contrary to defendant's arguments, however, neither of those constitutional provisions were applicable at the time when defendant made his disputed statements. *See State v. Davis*, 313 Or 246, 259, 834 P2d 1008 (1992) (discussing scope of Article I, section 11); *Michigan v. Jackson*, 475 US 625, 629-32, 106 L Ed 2d 631, 106 S Ct 1404 (1986) (discussing scope of Sixth Amendment).

suspect in custody from being 'badgered' by the police." 309 Or at 572 (quoting *Oregon v. Bradshaw*, 462 US 1039, 1044, 103 S Ct 2830, 77 L Ed 2d 405 (1983)). After a suspect in custody asserts the right to counsel, however, the suspect remains free to waive that right by initiating further contact with the police. *Kell*, 303 Or at 95-100.

The trial court in this case concluded that defendant made an unequivocal request for counsel when he told Newell and Skinner, "I think that I do need a lawyer. I do." The trial court also concluded that, despite defendant's unequivocal request, those detectives failed to cease the interrogation.

We agree with both of those legal conclusions. *See State v. Charboneau*, 323 Or 38, 55, 913 P2d 308 (1996) (court examines whether defendant's request for lawyer unequivocal as matter of law); *Montez*, 309 Or at 572-73 (examining whether officer's questions constituted continued interrogation as matter of law). Defendant's statement, when viewed in its entirety, expressed unambiguously that he wished to speak with a lawyer before talking to the detectives. Although Newell and Skinner appeared to recognize defendant's intent in making that statement, they nevertheless continued to probe defendant by repeatedly expressing curiosity about his motive for the crimes and by informing defendant that they were interested in hearing defendant's side of the story.

■ As the trial court observed, defendant did not respond to that probing by making any further inculpatory statements to Newell and Skinner. Defendant nevertheless argues, however, that the failure of Newell and Skinner to cease the interrogation and provide him with a lawyer rendered his subsequent statements to George and Doney inadmissible. Although he acknowledges that he initiated that subsequent police contact, defendant contends that he did so only because Newell and Skinner's failure to provide him with a lawyer had caused him to think that "his attempt to gain counsel was futile, and that he might as well talk to the police."

We are unpersuaded by defendant's argument. Although Newell and Skinner unlawfully continued the first

interview after defendant had invoked his right to counsel, that unlawful conduct did not induce defendant's subsequent statements to George and Doney. Instead, the police left defendant alone after terminating that first interview, and defendant himself reinitiated contact with the Medford detectives after having no further police contact for the period of one hour. When George and Doney responded to defendant's request to speak with the detectives, they again ensured that defendant understood that he had the right to remain silent and to have counsel present for any police interrogation. Defendant confirmed that he understood those rights and then asked the detectives what they wished to know about the crimes. Although it is true that George and Doney met with defendant before any effort had been made to secure a lawyer for him, nothing in the record suggests that defendant reinitiated contact with the police because he believed that the police would not fulfill that request. Indeed, as noted above, George and Doney began the interview by confirming that defendant understood that he had the right to counsel, and Newell and Skinner also had informed defendant that he would have a hearing before a judge that same day. We further reject defendant's suggestion that the passage of an hour's time gave rise to a reasonable inference that the police had planned to deny defendant's request for counsel. In view of the totality of the circumstances, we conclude that defendant made a knowing and voluntary waiver of his right to counsel under Article I, section 12, before making the challenged statements to George and Doney.

We reach that same conclusion when we consider defendant's arguments under the Fifth Amendment. Similarly to this court, the United States Supreme Court has held that the Fifth Amendment requires the police to cease all questioning after a suspect invokes his or her right to counsel, unless the suspect initiates further contact on his or her own. *Edwards*, 451 US at 484. As described above, defendant here initiated the interview with George and Doney without any police prompting. In addition, as the trial court stressed, defendant did not make any inculpatory statements in response to Newell and Skinner's probing after he had invoked his right to counsel. *Cf. Missouri v. Seibert*, 542 US 600, 124 S Ct 2601, 159 L Ed 643 (2004) (recitation of

*Miranda* warnings insufficient to render confession admissible under Fifth Amendment when warnings came during same interrogation in which defendant already had made essentially same confession before receiving any warnings). In sum, the trial court did not err in rejecting defendant's argument that his statements were inadmissible because they had been obtained in violation of his right to counsel under Article I, section 12, and the Fifth Amendment.

## 2. *Voluntariness of Defendant's Statements*

We next consider whether defendant's statements to George and Doney were voluntary for purposes of Article I, section 12, the Fifth Amendment, and the Due Process Clause of the Fourteenth Amendment. The test for voluntariness under both the state and federal constitutions is whether, under the totality of the circumstances, it is apparent that the "defendant's will was not overborne and his capacity for self-determination was not critically impaired." *State v. Vu*, 307 Or 419, 425, 770 P2d 577 (1989); *see also Schneckloth v. Bustamonte*, 412 US 218, 93 S Ct 2041, 36 L Ed 2d 854 (1973) (applying same test for purposes of Fifth Amendment and Due Process Clause). In reviewing the voluntariness of a defendant's statements, we are bound by the trial court's findings of historical fact, but must assess independently the ultimate legal determination of voluntariness. *Stevens*, 311 Or at 135.

In this case, defendant contends that his statements during his interview with George and Doney were involuntary because he had been held "isolated" and sometimes handcuffed in an interrogation room for several hours before making those statements. As further support for his argument, he points out again that Newell and Skinner failed to terminate the first interview immediately after his request for a lawyer and then failed to take any steps to obtain a lawyer for him.

We agree with the trial court that those facts are insufficient to provide the basis for the conclusion that defendant's statements were involuntary. As discussed above, defendant made no additional inculpatory statements to Newell and Skinner after his request for counsel during the first interview. The conditions of defendant's custody also

certainly were not so oppressive as to undermine defendant's ability to exercise his free will. Finally, none of the detectives made any promise of leniency or otherwise employed subterfuge to obtain defendant's statements. The trial court did not err by denying defendant's motion to suppress those statements.

C. *Admission of Evidence of Body of Unrelated Victim*

 In another assignment of error, defendant contends that the trial court erred by denying his motion to exclude evidence of the body of George (the man who defendant confessed to killing in California) during defendant's penalty trial. Before turning to defendant's arguments, we first provide the relevant factual background. *See Stevens*, 311 Or at 126-27 (this court bound by trial court's findings of fact and, if trial court did not make express findings respecting all pertinent historical facts, then court presumes that trial court found facts consistent with its ultimate conclusion).

During the above-described interview with defendant on December 13, 1995, about the Ellis and Abdill murders, Detectives George and Doney also asked defendant about the earlier murder of George in California and, specifically, questioned defendant about where he had hidden George's body. Although he admitted to murdering George, defendant refused to disclose the location of George's body to the detectives.

At some point during that interview, defendant's father, Kenneth Acremant, Sr. ("Kenneth Sr."), arrived at the station house of the Stockton Police Department where defendant was being held. Detective Newell, along with two other detectives, spoke with Kenneth Sr. about defendant's confessions to the three murders and requested that Kenneth Sr. ask defendant about the location of George's body. Without informing defendant that the detectives had instructed him to do so, Kenneth Sr. asked defendant where he had hidden George's body when he spoke with defendant that same day. Defendant also refused to disclose the location of George's body to Kenneth Sr.

After having failed to obtain any information from defendant, Kenneth Sr. informed the police that he suspected

that defendant had hidden George's body in one of the mine shafts or in the cave on Kenneth Sr.'s ranch.[18] The police made arrangements with Kenneth Sr. to search his ranch on December 18, 1995. The police did not ask Kenneth Sr. to speak with defendant again about the location of George's body.

On December 17, 1995, Kenneth Sr. had another visit with defendant. During that visit, Kenneth Sr. informed defendant that the police would be searching Kenneth Sr.'s ranch the next day with police dogs trained to detect a deceased human body. Kenneth Sr. again did not disclose to defendant that the detectives previously had asked him to question defendant about the location of George's body. Defendant advised Kenneth Sr. that he had hidden George's body in a particular mine shaft on Kenneth Sr.'s ranch that was used for dumping trash. The police searched that mine shaft the next day and discovered George's body.

Before the start of his penalty trial, defendant moved to exclude evidence of the statements that he had made to Kenneth Sr. on both December 13 and 17, along with the derivative evidence of George's body. Defendant argued that, because the police had directed Kenneth Sr. to ask defendant about the location of George's body, Kenneth Sr. had acted as an agent of the state during both his interviews with defendant and, for that reason, should have provided defendant with *Miranda* warnings before questioning defendant. The state disputed that Kenneth Sr. had acted as an agent of the state during his second interview with defendant and asserted that, in any event, the police would have discovered George's body through ordinary investigative procedures even if defendant had not disclosed its location to Kenneth Sr.

After a hearing, the trial court determined that, as a matter of law, Kenneth Sr. "was still acting as an agent of the police" during the second interview with defendant on December 17. As the factual basis for that legal conclusion, the trial court stated:

[18] Kenneth Sr.'s ranch encompassed eight mine shafts and one cave.

"I think the time frame, the closeness in time is strong—is a strong indicator that there had not been enough lapse of time.

"I think there's a—you know, always a tremendous psychological conversion, the forces on any parent in this situation. And I think that the tremendously conflicting position that a parent finds himself in in this situation is very— and these facts that are before the Court—is one of great difficulty and great desire to cooperate. And I think that the suggestion by the police enlisted him as an agent, and he still wanted to comply, and that was part—and he testified that that was part of the motivating feature. So, I believe that he was still an agent of the police [during the interview on December 17, 1995]."

Based upon that conclusion, the trial court determined that Kenneth Sr. had been required to provide defendant with *Miranda* warnings and that his failure to do so required the court to suppress defendant's statements.[19] The trial court further ruled, however, that the evidence of George's body was admissible because the state had proved that it was "absolutely inevitable" that the police would have discovered George's body in any event through ordinary investigative procedures. Defendant assigns error to that ruling.

Before this court, defendant focuses his arguments upon whether the trial court correctly concluded that the state had proved by a preponderance of the evidence that it would have discovered George's body in any event through ordinary investigative procedures. *See State v . Johnson*, 335 Or 511, 522-26, 73 P3d 282 (2003) (discussing "inevitable discovery" doctrine). For its part, the state challenges the trial court's conclusion that Kenneth Sr. had acted as an agent of the state during his second interview with defendant. The state also argues that, even if Kenneth Sr. had been acting as an agent of the state, he was not required to inform defendant of his rights under Article I, section 12, because the "compelling" circumstances giving rise to the warnings

---

[19] Although it concluded that Kenneth Sr. also had been acting as an agent of the state during his interview with defendant on December 13, the trial court ruled that defendant's statements from that interview were admissible because the detectives' recitation of *Miranda* warnings earlier that day was "sufficient" for Kenneth Sr.'s interview. That ruling is not at issue before us on review.

requirement under Article I, section 12, are not present when a suspect is unaware that he or she is speaking to a police agent. *See State v. Smith*, 310 Or 1, 7, 791 P2d 836 (1990) (warning of rights under Article I, section 12, of Oregon Constitution required when police questioning occurs in "setting which judges would and officers should recognize as 'compelling' " (quoting *Magee*, 304 Or at 265; internal quotation marks omitted)); *cf. Illinois v. Perkins*, 496 US 292, 294, 110 S Ct 2394, 110 L Ed 2d 243 (1990) (Fifth Amendment does not require *Miranda* warnings when suspect is unaware that he or she is speaking with state agent).

We do not address defendant's argument regarding the trial court's inevitable discovery ruling or the state's second argument regarding the circumstances when Article I, section 12, requires a police agent to provide warnings to a suspect. Instead, we affirm the trial court's ruling because we conclude that, as a matter of law, Kenneth Sr. was not acting as a police agent on December 17 and, therefore, that his actions did not implicate Article I, section 12. *See Outdoor Media Dimensions Inc. v. State of Oregon*, 331 Or 634, 659-60, 20 P3d 180 (2001) (discussing "right for the wrong reason" principle for affirming judgment of trial court).[20]

In *Smith*, this court explained that, in deciding whether a private citizen acted as a "police agent" as a matter of law, a court must examine "if the police were directly or indirectly involved to a sufficient extent in initiating, planning, controlling or supporting" the citizen's activities. 310 Or at 13 (internal citations and quotation marks omitted). In that case, this court rejected the defendant's argument that his cellmate had acted as an agent of the state when the cellmate obtained information from the defendant that incriminated him in his wife's murder. In reaching that conclusion, this court observed that the cellmate had initiated contact with the sheriff's deputies about the defendant's statements and that the deputies had informed the cellmate that he

---

[20] As noted above, the United States Supreme Court expressly has held that the Fifth Amendment does not require that a suspect be given *Miranda* warnings when "the suspect is unaware that he [or she] is speaking to a law enforcement officer and gives a voluntary statement." *Perkins*, 496 US at 294. Thus, even if Kenneth Sr. had been acting as the state's agent, his failure to give defendant *Miranda* warnings would not have offended the Fifth Amendment.

could pass the information along, but was not required to do so. *Id.* at 14. The court also pointed out that the deputies had not made any deals with the cellmate for the information and that the cellmate had testified that his principle motivation for his information gathering "was his revulsion at the manner in which the victim was killed." *Id.*

In this case, we similarly conclude that the facts do not support the legal conclusion that Kenneth Sr. had been acting as an agent of the state at the time of his second interview with defendant on December 17. Although the police had asked Kenneth Sr. to question defendant about the location of George's body on December 13, the police had not instructed Kenneth Sr. to continue to try to obtain that information after defendant refused to disclose it. Rather, the police proceeded to make plans with Kenneth Sr. to search his ranch and to follow other leads that had surfaced. Indeed, the trial court found that, as a factual matter, Kenneth Sr.'s primary motivation for questioning defendant a second time about the location of George's body was Kenneth Sr.'s own personal desire to provide assistance to the police in the face of his son's crimes. Because the police lacked sufficient involvement in controlling and directing Kenneth Sr.'s actions on December 17 to render him a state agent, Kenneth Sr.'s actions did not implicate Article I, section 12. For that reason, the trial court did not err in admitting evidence of George's body during defendant's penalty trial.

D. *Entry of Multiple Aggravated Murder Convictions for Each Victim*

As noted previously, defendant pleaded guilty to two counts of aggravated murder involving Ellis, ORS 163.095(1)(d) and (2)(d), and two counts of aggravated murder involving Abdill, ORS 163.095(1)(d) and (2)(d). In its judgment, the trial court entered two aggravated murder convictions for each victim without any objection from defendant.

Citing this court's decision in *State v. Barrett*, 331 Or 27, 10 P3d 901 (2000), defendant assigns error to the entry of two aggravated murder convictions for each victim.

Defendant acknowledges that, because he did not object to the imposition of multiple convictions for each victim, he did not preserve this assignment of error. He urges, however, that this court should consider this claim of error as an "error apparent on the face of the record[.]" ORAP 5.45(6); *see State v. Reyes-Camarena*, 330 Or 431, 435, 7 P3d 522 (2000) (explaining and applying plain error doctrine). For its part, the state concedes that the judgment is erroneous and further agrees that, although it is unpreserved, this court nevertheless should exercise its discretion to review and correct that error.

In *Barrett*, this court determined that, although the state properly may charge a defendant with multiple counts of aggravated murder for a single victim based upon the existence of different aggravating circumstances under ORS 163.095, the aggravating circumstances listed under ORS 163.095 do not constitute "separately punishable offenses" for purposes of *former* ORS 161.062(1).[21] *Id.* at 36. Based upon that conclusion, this court held that, when a trial court convicts a defendant of multiple counts of aggravated murder for the death of a single victim based upon different aggravating circumstances, the trial court should enter only one judgment of conviction of aggravated murder for that victim, with the judgment enumerating each of the supporting aggravating factors. *Id.* at 37.

In light of this court's holding in *Barrett*, we agree with defendant and the state that the judgment entered is erroneous. We therefore remand the case for entry of corrected judgment of conviction reflecting defendant's guilt on the charge of aggravated murder for each victim, with the judgment separately enumerating the aggravating factors upon which each conviction is based.

_____

[21] *Former* ORS 161.062(1), *repealed by* Or Laws 1999, chapter 136, section 1, provided:

"When the same conduct or criminal episode violates two or more statutory provisions and each provision requires proof of an element that the others do not, there are as many separately punishable offenses as there are separate statutory violations."

That sentence now appears in identical form in ORS 161.067(1).

E. *Trial Court's Grant of State's Motion to Supplement the Record*

In another assignment of error, defendant contends that the trial court erred by granting the state's motion to supplement the record after the trial court reporter inadvertently erased approximately 90 minutes of the audio recording of defendant's penalty trial. Before turning to our discussion of defendant's arguments, we first provide the relevant factual background.

As noted previously, 338 Or at 310, after the jury made the requisite findings under ORS 163.150(1)(b), the trial court entered the judgment of conviction and sentenced defendant to death on October 27, 1997. On November 13, 1997, the trial court's electronic reporter was duplicating the audiotapes of defendant's penalty trial at the request of the district attorney's office in Tulare County, California, for the preparation of that state's case against defendant for the murder of George. In the process of duplicating the tapes, the trial court reporter inadvertently reversed the original tape and the blank tape on the duplicator, and 90 minutes of the audio recording of defendant's penalty trial on October 10, 1997, were erased.

On November 26, 1997, the trial court clerk submitted to this court the death-penalty review packet relating to defendant's case. *See* ORAP 12.10(3), (4) (immediately after entry of judgment of conviction and sentence of death, trial court clerk shall prepare death-penalty review packet and send original copy to State Court Administrator). On December 30, 1997, after learning about the erased audiotape, the prosecutor filed a motion with the trial court to supplement the record or, alternatively, to submit an agreed narrative statement.[22] The prosecutor supported his motion with an affidavit from the trial court reporter describing how the

---

[22] ORS 19.380 provides:

"In lieu of or in addition to a transcript, the parties may prepare an agreed narrative statement of the proceedings below or parts thereof. The narrative statement shall be signed by the parties or their attorneys and shall be filed with the trial court administrator within 30 days after the filing of the notice of appeal. When such a statement is filed, the appellant shall promptly notify the State Court Administrator, at Salem."

audiotape inadvertently had been erased, along with the trial court reporter's log of the trial events that the erased tape had recorded. The trial court reporter's log showed that the erased tape had included the entire testimony of seven state witnesses and the beginning of the testimony of an eighth state witness.

In addition to those materials, the prosecutor also supported his motion with his own affidavit attesting to the trial events that the erased audiotape had recorded. In that affidavit, the prosecutor attested that the following trial events had occurred before the trial court: (1) defense counsel submitted a motion *in limine* to exclude victim-impact testimony relating to the murder of George, which the trial court granted; (2) defense counsel renewed his previously denied motion to exclude evidence of George's body, which the trial court declined to revisit; and (3) the state submitted a proposed written order relating to the trial court's previous ruling on defendant's constitutional challenges to the composition of the jury pool, which the trial court declined to sign to allow defense counsel the opportunity to respond.

In addition to those events, the prosecutor also averred that the following trial events had occurred before the jury: (1) Deputy Mark Moore, Department of Corrections, testified on behalf of the state about a rope made of bed sheets that he found in defendant's cell; (2) Shawn Harper, defendant's former cellmate, testified on behalf of the state about witnessing defendant practicing a stabbing motion with a pencil; (3) Kevin Louis Clark, Deputy Coroner for Calaveres County, California, testified on behalf of the state about picking up George's body from Kenneth Sr.'s ranch, and he identified state exhibit 98 as a photograph of George's body wrapped in a body bag; (4) Thomas Crabtree, Deputy Coroner for Tulare County, California, testified on behalf of the state about taking x-rays of George's body while it was still in the body bag, and he identified state exhibit 98 as a photograph of George's body wrapped in a body bag; (5) Dr. John Miller testified on behalf of the state about having been George's dentist, and he identified state exhibits 101 and 102 as x-rays that Miller had taken of George's jaw on July 31, 1991; (6) Dr. Peter Raventos, forensic odontologist for Tulare County, California, testified on behalf of the state

about removing the upper and lower jaws from George's body, about making a positive identification of George's body from his dental records, and identified state exhibits 103 and 104 as the x-rays that he had taken of George's jaws; and (7) Timothy Sola, a crime technician with the Visalia Police Department in California, testified on behalf of the state about George's body having been wrapped in several layers of plastic and duct tape, about attending George's autopsy, about physical evidence removed from George's body during the autopsy, and he identified state exhibit 4 as a photograph of George's body on the autopsy table.

Following that testimony, the prosecutor further attested that the defense counsel had objected outside the presence of the jury to the introduction of state exhibit 108, a color photograph of the bullet wounds to George's head. The prosecutor attested that the trial court had overruled defendant's objection and also had denied defendant's subsequent request that a black-and-white photograph be substituted for that color photograph. Finally, the prosecutor averred that the state had called Dr. Gary Walter, whose erased testimony concerned his qualifications as a forensic pathologist licensed to practice in California.

In his response to the state's motion, defendant agreed with the state that the erasure of the audiotape had been inadvertent. Defendant argued, however, that the trial court lacked jurisdiction to rule upon the state's ·motion because the death-penalty review packet for defendant's case already had been filed with this court. *See also* ORAP 12.10(1), (3) (providing that no notice of appeal is required and describing requirements for death-penalty review packet). Defendant also rejected the state's offer to stipulate to an agreed narrative statement and asserted that neither defense counsel nor defendant had sufficient memory of the trial events to advise the trial court "as to how the missing record can be adequately reconstructed."

At the hearing on the state's motion on January 27, 1998, the trial court rejected defendant's argument that it lacked jurisdiction to supplement the record. The trial court also allowed the state's motion to supplement the record, stating specifically:

"[The prosecutor's affidavit] corresponds to my recollection of the testimony, the issues raised, and the rulings of the Court.

"I cannot supplement that Affidavit with specificity regarding the State and Federal Constitutional grounds that the defense raised—just as [the prosecutor] has indicated in his cross-examination that he cannot—other than to say that every state and federal—and [defense counsel's] consistency and thoroughness and professionalism in professionalism—in citing both the State and Federal grounds on each of [defense counsel's] objections was routine during the trial and occurred, and I believe occurred on these rulings also.

"As far as the victim impact statements or the victim impact issue regarding what was admissible in relation to the Scott George murder, his death, he was not a victim in these proceedings. [Defense counsel] moved against that. The State conceded that, and I ruled that that would not come in; it didn't come in.

"As far as the Motion to Suppress, my clear recollection, as far as the father's statements, whether or not the father was an agent of the police and needed to Mirandize, that no new legal grounds or factual grounds were discovered during the trial portion that had not been fully articulated in the Motion to Suppress itself.

"I'm going through the Affidavit, which is the pause. Regarding Deputy Mark Moore from the Oregon intake center, this was the law enforcement person that testified about the two feet of rope made from strips of sheeting, bed sheets, I agree with [the prosecutor's] Affidavit that there was one objection made, and it was sustained. And it was made by the defense, and it was sustained as to whether or not prisoners sometimes use ropes as weapons, and I sustained that objection. At that point I wasn't concerned what other inmates did.

"I have nothing to add in relation to the testimony of Shawn Harper beyond the Affidavit. Again, I find it is accurate. I find the whole thing, the whole Affidavit, is accurate.

"As far as the pictures were concerned, I ruled on several pictures in this case, and I ruled that the amount of pictures were not excessive; that they were not unduly inflammatory, and once I ruled that way on the color photos, there

was no reason for me, then, to want to insert or think that it was appropriate, in their place, to put a black and white photo.

"The black and white photo, had it been available—I don't know if it was available or not—I ruled that I would not order a substitution of that. Clearly a black and white photo is less vivid and, perhaps, less demonstrative than a color photo.

"I admitted the color photos because I did not believe that they were unduly gruesome, inflammatory, would not counter the balance of fairness that the law requires in this case. And they were not unduly numerous in number, the photos that were received, and that's the same ruling I made on all the photos.

"I did not tie that ruling to any particular statutory, Constitutional, or evidentiary rule basis. It was just a fact decision that I made. I recall that the testimony of Dr. Gary Walter was the testimony that—which is on the record except for, I believe, the first part of his describing his credentials and the—and I do not believe that his credentials were challenged, and I firmly know that, had they been, I would have recognized him as an expert because I believe that it was clear that he was an expert; that the balance of his testimony which is on the record is the culmination of all the testimony regarding the body, photographs, and all that stuff that led up, and that is with us.

"That concludes what I'm going to say about that. Once again, I rule that I have jurisdiction to do this. I have it as Judge in this court; that the Affidavit attached to the Motion to Supplement the Record by [the prosecutor] is accurate; and that I will supplement the record with that Affidavit and the comments that I have just made."

After the trial court granted the state's motion to supplement the record, the transcript settled without further objection. Defendant then filed a motion with this court titled "Objection To Settling Transcript/Motion to Vacate Trial Court Order Supplementing Transcript." The state opposed that motion, and this court denied it.[23]

---

[23] In a separate assignment of error, defendant also assigns error to this court's denial of defendant's motion to vacate the trial court order supplementing the transcript. We construe defendant's argument to be a request for reconsideration of that decision, and we deny that request.

On review, defendant repeats his argument that the trial court lacked jurisdiction to supplement the record after the trial court clerk filed the death-penalty review packet relating to defendant's case with this court. Defendant also argues that, in any event, this court should grant defendant a new penalty trial under ORS 19.420(3) because the appellate record is insufficient for the prosecution of an appeal of defendant's death sentences. For the reasons stated below, we reject both defendant's arguments.

### 1. *Trial Court's Authority to Supplement Record*

We first address defendant's argument that the trial court lacked authority to grant the state's motion to supplement the record. *Former* ORS 163.150(1)(g) (1997) provided that, when a defendant is sentenced to death, "[t]he judgment of conviction and sentence of death shall be subject to automatic and direct review" by this court.[24] ORAP 12.10 does not require a defendant sentenced to death to file a notice of appeal, and, instead, charges the trial court clerk with filing a packet with the State Court Administrator that includes a copy of the judgment of conviction and sentence of death, along with a certificate and cover sheet providing information about the underlying trial court proceeding.

Defendant is correct in asserting that those provisions vest this court with jurisdiction immediately upon entry of the judgment of conviction and sentence of death. Contrary to defendant's arguments, however, that conclusion does not mean that the trial court lacked authority to consider the state's motion to supplement the transcript.

ORAP 12.10(5)[25] prescribes the manner and the timing for the preparation of a transcript of a trial court proceeding resulting in the imposition of a death sentence. That rule

---

[24] As noted previously, 338 Or at 305 n 1, the 1999 Legislative Assembly repealed *former* ORS 163.150(1)(g) (1997). *See* Or Laws 1999, ch 1055, § 1. Death sentences now are subject to "automatic and direct review" by this court under ORS 138.012(1).

[25] ORAP 12.10(5) (1997) provided:

"Service of a copy of the packet on a court reporter shall be deemed to be an order by the trial court that the court reporter immediately prepare a transcript of all portions of the criminal proceeding reported by that reporter, including all pre-trial hearings but excluding selection of the jury. If either the state or the defendant desires that the report of the jury selection proceedings

provides that, as in other criminal appeals, the trial court settles the transcript pursuant to ORS 138.185 and ORS 19.370. *See also Fry v. Ashley*, 228 Or 61, 71, 363 P2d 555 (1961) ("It is elementary that it is the circuit court, not this court, which determines the correctness of the transcript which comes to this court on an appeal.").

In this case, the prosecutor filed the motion to supplement the transcript pursuant to *former* ORS 19.370(3) (1997).[26] That statute provided, in part:

> "Within 15 days after the transcript is filed, *any party may move the trial court for an order to correct any errors appearing in the transcript or, where the interests of justice require, to have additional parts of the proceedings included in the transcript.* A copy of any such motion shall be filed with the court to which the appeal is made. The trial court shall direct the making of such corrections and the adding of such matter as may be appropriate and shall fix the time within which such corrections or additions shall be made."

(Emphasis added.) As the state correctly notes, this court previously has construed the wording in *former* ORS 19.370(3) to authorize the trial court to supplement the record when the court reporter has failed to record a trial court event. *See Fry*, 228 Or at 73 ("If the stipulation referred to was entered into during the trial, but not taken down by the reporter, and the appellant wished to rely upon it here, he

---

be transcribed, that party must apply to the Supreme Court for an appropriate order, which will be made only upon a showing of good cause for preparation of that transcript. A transcript shall meet the specifications of Rule 3.35. A transcript shall be filed within 60 days of the date the packet is served on the court reporter. If the court has allowed preparation of a transcript of jury selection, the transcript shall be due 30 days after the date of the order allowing the transcript. Transcripts shall be settled in the same manner as on an appeal pursuant to ORS 138.185[.]"

ORS 138.185 provides that the record in a criminal matter shall be prepared in the manner that ORS chapter 19 prescribes. This court amended 12.10(5) in 1999, but did not change the substance of that rule. This court amended ORAP 12.10(5) in 2005 to add subsection numbering, but made no alterations to the substance of that rule.

[26] The 2001 Legislative Assembly renumbered *former* ORS 19.370(3) to 19.370(5), but otherwise did not alter the wording that is quoted above. Or Laws 2001, ch 341, § 1. Pursuant to its authority under ORS 173.160, Legislative Counsel renumbered *former* ORS 19.078 to 19.370 in 1997. *See* ORS 173.160 (providing that Legislative Counsel has authority to "renumber sections and parts of sections of the Acts").

could and should have moved the trial court to have it 'included in the transcript' as 'additional parts of the proceedings[.]' " (construing *former* ORS 19.078(3), *renumbered as* ORS 19.370(3)). Thus, consistently with *former* ORS 19.370(3) (1997), the trial court had authority to include in the transcript as "additional parts of the proceedings" the hearing on the state's motion in which the trial court supplemented the record with the prosecutor's affidavit and with the trial court's own statements describing the trial court events that the erased audiotape had recorded.

2. *Defendant's Entitlement to a New Penalty Trial Under ORS 19.420(3)*

■ Having concluded that the trial court had authority to supplement the record in the manner that it did, we now consider defendant's argument that this court nevertheless should grant defendant a new penalty trial under ORS 19.420(3). That statute provides:

> "Whenever it appears that an appeal cannot be prosecuted, by reason of the loss or destruction, through no fault of the appellant, of the reporter's notes or audio records, or of the exhibits or other matter necessary to the prosecution of the appeal, the judgment appealed from may be reversed and a new trial ordered as justice may require."

In *Smith v. Custom Micro, Inc.*, 311 Or 375, 811 P2d 1371 (1991), this court construed that same statute, then numbered as *former* ORS 19.130(3),[27] to determine the circumstances under which an appellate court should exercise its discretion to grant an appellant a new trial under that provision. As an initial matter, the court observed that the statute provides an appellate court with discretionary authority to grant a new trial only when a record or exhibit necessary to the prosecution of an appeal is destroyed and that destruction occurred through no fault of the appellant. *Id.* at 378. In this case, there is no dispute that both those statutory prerequisites are met. The question, instead, is whether this court should exercise its discretion to grant defendant a new

---

[27] Pursuant to its authority under ORS 173.160, Legislative Counsel renumbered *former* ORS 19.130(3) to ORS 19.420(3) in 1997. *See* ORS 173.160 (providing that Legislative Counsel has authority to "renumber sections and parts of sections of the Acts").

penalty trial in light of the 90 minutes erased from the audio record of defendant's penalty trial.

In *Smith*, this court identified the considerations that guide an appellate court's discretion in deciding whether to grant a new trial under ORS 19.420(3). Specifically, this court instructed that, to be entitled to a new trial under ORS 19.420(3), "[t]he appellant (1) must show due diligence in attempting to find and supply a record for the purposes of appeal; and (2) must make 'at least a *prima facie* showing of error, or unfairness in the trial, or that there had been a miscarriage of justice.'" *Id.* at 379 (quoting *Ethyl Corp. v. Jalbert*, 270 Or 651, 655, 529 P2d 368 (1974)).

In this case, defendant contends that he has satisfied both those criteria. He first argues that defense counsel attempted to reconstruct the record for purposes of appeal, but lacked sufficient recall of the erased trial events to do so. Defendant also points to "inconsistencies" between the prosecutor's affidavit and the trial court reporter's log of trial events, and asserts that, as a result of the missing 90 minutes, appellate counsel and this court are precluded from identifying possible errors that occurred during defendant's penalty trial, including instances of prosecutorial misconduct, instances of inadequate assistance of counsel, and instances of trial court error.

After considering defendant's arguments, we are unpersuaded that this is an instance in which we should exercise our discretion under ORS 19.420(3) to grant a new trial. The 90 minutes of erased audiotapes represented only a very short part of defendant's penalty trial, and the trial court was able to reconstruct a record of the lost trial events with considerable detail. Other than pointing to "inconsistencies" between the prosecutor's affidavit and the trial court reporter's log, defendant does not allege that the supplemental record that the trial court added is not an accurate representation of the trial events that the erased tape had recorded. In addition, despite his many suggestions of possible error, defendant fails to make a persuasive argument that the missing transcript will prevent review by this court of any error or miscarriage of justice that actually occurred. In sum, even assuming that defendant showed due diligence

in attempting to supply a record for purposes of appeal, defendant is not entitled to a new penalty trial because he has failed to make "a *prima facie* showing of error, or unfairness in the trial, or that there had been a miscarriage of justice." *Smith*, 311 Or 379 (internal citations and quotation marks omitted).

## III. CONCLUSION

In summary, we conclude that none of defendant's assignments of error is well taken, except for one relating to the entry of multiple aggravated murder convictions for each victim. Because the trial court erred by entering more than one aggravated murder conviction for each victim, we remand the case for entry of a corrected judgment of conviction to reflect defendant's guilt as to the charge of aggravated murder for each victim based upon alternative aggravating factors. We otherwise affirm the judgment of conviction and the sentences of death.

The judgment of conviction and sentences of death are affirmed. The case is remanded to the circuit court for further proceedings.