Argued and submitted June 19, 2013, affirmed April 23, petition for review denied August 7, 2014 (355 Or 880)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

BRENDON ROBERT LEWIS DOYLE,
*Defendant-Appellant.*

Washington County Circuit Court
C101100CR; A147220

324 P3d 598

Ingrid A. MacFarlane, Senior Deputy Public Defender, argued the cause for appellant. With her on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Douglas F. Zier, Senior Assistant Attorney General, argued the cause for respondent. With him on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Duncan, Presiding Judge, and Tookey, Judge, and Schuman, Senior Judge.*

_____
* Tookey, J., *vice* Wollheim, J.

TOOKEY, J.

**TOOKEY, J.**

Defendant challenges a judgment of conviction for one count of second-degree sodomy, ORS 163.395, and two counts of first-degree sexual abuse, ORS 163.427, contending that the trial court erred when it denied his motion to suppress statements that he made during a custodial interview at the Washington County Jail. Defendant argues that the investigating detectives violated his right to remain silent and right to counsel under Article I, section 12, of the Oregon Constitution[1] and the Fifth Amendment to the United States Constitution,[2] and that those *Miranda*[3] violations affected the validity of his subsequent waiver of his constitutional rights at the jail. Defendant also argues that the statements that he made at the jail were based on an implied promise of leniency and were involuntary. We affirm.

## I. FACTS

This court reviews a trial court's denial of a motion to suppress for legal error. *State v. Mitchele*, 240 Or App 86, 88, 251 P3d 760 (2010). We are bound by the trial court's findings of fact if there is sufficient evidence in the record

---

[1] Article I, section 12, provides, in part, "No person shall be * * * compelled in any criminal prosecution to testify against himself." The right against self-incrimination, as provided by Article I, section 12, includes the "derivative right" to the assistance of counsel during custodial interrogation. *State v. Scott*, 343 Or 195, 200, 166 P3d 528 (2007).

[2] The Fifth Amendment provides, in part, "No person * * * shall be compelled in any criminal case to be a witness against himself[.]" The Fifth Amendment right against self-incrimination "comprehends not merely a right to consult with counsel prior to questioning, but also to have counsel present during any questioning if the defendant so desires." *Miranda v. Arizona*, 384 US 436, 470, 86 S Ct 1602, 16 L Ed 2d 694 (1966).

[3] In *Miranda*, 384 US at 444, the United States Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards [(*i.e.*, *Miranda* warnings)] effective to secure the privilege against self-incrimination." Article I, section 12, is "an independent source for warnings similar to those required under the Fifth Amendment to the United States Constitution by *Miranda* * * *." *State v. Moore/Coen*, 349 Or 371, 382, 245 P3d 101 (2010), *cert den*, ___ US ___ (2011). Accordingly, Article I, section 12, requires the police to give a defendant who is in custody *Miranda*-like warnings prior to questioning. *Id.* Article I, section 12, also requires the police to give a defendant *Miranda*-like warnings when the defendant is "in circumstances that, although they do not rise to the level of full custody, nevertheless create a setting which judges would and officers should recognize to be compelling." *Id.* (internal quotation marks omitted).

to support them. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993). The following facts are taken from or are consistent with the trial court's findings.

After 13-year-old W reported that defendant, then age 18, had engaged in sexual contact with W in defendant's bedroom, Tigard Police detectives Hockin and Lee interviewed defendant on the porch of defendant's house. Almost immediately after arriving at defendant's house, Hockin read defendant *Miranda* warnings, and defendant acknowledged that he understood his rights. Defendant denied that he had engaged in sexual contact with W and denied that W had ever been at defendant's house. Hockin told defendant that the detectives had seen approximately 155 text messages between defendant and W and that some of those messages corroborated W's allegation. The following exchange then took place:

> "DETECTIVE LEE:   I think what Detective Hockin is trying to say is that, you know, we want to give you this opportunity. The reality is—I understand. You get a free pass because here it is. We understand that when we come to your door, everybody has a self-preservation instinct. You know what I mean? Everybody initially lies to the police. You have an instinct to preserve yourself, but the reality is—

> "THE DEFENDANT:   Well, you see, I've done this before, okay, a long time ago, okay? And I obviously know how this works. I mean I—I'm telling the truth right now. He never came over to my house, okay? And if—nothing ever happened."

The detectives stated that they could track W's cell phone and collect DNA evidence to prove that W had been in defendant's bedroom. Defendant then stated, "I would like to have an attorney or something here present." Hockin told defendant that the conversation would end if defendant wanted an attorney. After some discussion about whether defendant wanted to call an attorney, Hockin added that the detectives knew "89 percent of what there [was] to know about the case" and that they did not "even really need" defendant's statement, but "in fairness" to defendant, defendant had "the right to tell [the detectives his] side." Hockin further added that defendant could "stick with" his

earlier statements regarding W and that they would give defendant "a few more seconds to digest that[.]" Defendant asked if his probation officer knew what was happening, and Hockin told defendant that the probation officer knew about the allegation and had read the initial report. Hockin offered defendant a "[l]ast chance" to add anything, defendant declined, and the detectives concluded the interview at 6:50 p.m. Defendant was arrested on a parole violation, and at approximately 7:00 p.m., was transported to the Washington County Jail. The drive lasted 30 to 40 minutes. During transport, the detectives did not ask defendant any questions.

When Hockin, Lee, and defendant arrived at the jail, they pulled into the sally port. The detectives went behind the car, where they stood with the trunk open, engaging in "small talk" and "rummaging through the trunk" while defendant remained in the back seat of the car with the windows rolled up. Hockin expressed surprise to Lee that defendant did not "admit to something [that they] could obviously prove, the fact that [W] was over at [defendant's] house." As the detectives escorted defendant from the car to the door of the intake room, defendant, who had overheard the detectives' conversation, asked, "Can we talk?" Hockin responded that they could talk again after defendant was booked and after they had "another conversation about *Miranda* * * *."

After defendant was booked, Hockin, Lee, and defendant met inside the jail in a room that was adjacent to the intake room. It was 8:00 p.m. Hockin read defendant *Miranda* warnings a second time, and defendant again acknowledged that he understood them. The detectives then began a second interview. Hockin first described the events that had earlier taken place—that the detectives had interviewed defendant on the porch of defendant's house, that defendant had mentioned an attorney, and that the detectives had "pretty much shut down the interview" and transported defendant to jail, where defendant asked the detectives if they could talk again. The following exchange then took place:

"DETECTIVE HOCKIN: You still have a right to an attorney. Just because you're—you mentioned one earlier, we terminated the interview, and now you're saying you

want to talk. You can talk, but you can also talk with an attorney.

"THE DEFENDANT: I don't see (inaudible) be any better, to telling tell the truth right away, so—

"DETECTIVE HOCKIN: Okay. It's completely up to you.

"THE DEFENDANT: Yeah.

"DETECTIVE HOCKIN: All right. Well, you understand the importance of us having to go through all this because it's different again. That was just a conversation with you on your porch earlier, and now this is—you're in jail and you previously had talked about an attorney. Do you understand why we're going through all this?

"THE DEFENDANT: Yeah."

Defendant then gave a "dramatically revised" account of events, admitting that W had been at defendant's house and that defendant had had sexual contact with W. At the close of the second interview, the detectives posed the following questions:

"DETECTIVE HOCKIN: *** [D]o you feel comfortable that we gave you a fair opportunity to talk to us about your side of the story?

"THE DEFENDANT: Yeah.

"DETECTIVE HOCKIN: Okay. Do you feel like we in any way coerced you or threatened you or made you say something you didn't want to say?

"THE DEFENDANT: No.

"DETECTIVE LEE: Did we make you any promises that, you know, you admit to this and we'll give you some special deal?

"THE DEFENDANT: Huh-uh (negative response). No."

## II. PROCEDURAL HISTORY

Before trial, defendant moved to suppress "any and all" of his statements, that is, those that he made to the detectives on the porch of defendant's house and at the jail, arguing that they were obtained in violation of his constitutional right to remain silent and right to counsel.

During a hearing on defendant's motion to suppress, defendant argued that he invoked those constitutional rights on the porch of his house when he stated, "I would like to have an attorney or something here present" and that the detectives violated those rights when they failed to cease questioning him on the porch of defendant's house and talked about the case behind the car at the jail. Defendant also argued that he made statements at the jail only in response to an implied promise of leniency and that those statements were therefore involuntary. Hockin testified that neither he nor Lee made defendant any promises, that they had engaged in "small talk" behind the car at the jail, and that he had merely expressed surprise that defendant had not admitted that W had been at defendant's house. Hockin further testified that he did not think that defendant could hear the conversation and that he did not intend for defendant to hear the conversation. Defendant testified that, when the detectives were talking about the case behind the car at the jail, they said that "it would have been so much easier" for him if he had "just confessed back at the house[.]"

During cross-examination, defendant testified that he initiated further contact with the detectives, but only because he believed that the detectives would release him or give him a lenient sentence if he told them what they wanted to hear:

"[DEFENDANT:] I did ask Detective Hockin to continue the conversation, but the reason I asked him was because I heard them talking behind the car. And I also remembered [Detective] Lee, I think it was, saying, Oh, this is—you only get one free chance to say your thing, say your, say your story or whatever. So, yeah, I heard them talking behind the car. I was like, maybe this'll get me released or get some lenient sentence or something like that, you know.

"[PROSECUTOR:] So it was at that point that you decided you wanted to talk to the police officers again and tell them the truth?

"[DEFENDANT:] Just to tell them what they wanted to hear, yes.

"[PROSECUTOR:] So it wasn't the truth?

"[DEFENDANT:]   Hmm-mm (negative response).

"[PROSECUTOR:]   It was a lie?

"[DEFENDANT:]   Yes.

"[PROSECTOR:]   How did you expect a lie to get you out of custody?

"[DEFENDANT:]   'Cause it's what they wanted to hear."

The trial court denied defendant's motion to suppress. The trial court first found that defendant unequivocally invoked his right to counsel on the porch of his house when he stated, "'I would like [to have] an attorney [or something here] present.'" The trial court also found that the conversation at that point should have stopped, but that there "were some questions that followed after that." The trial court also found that the statements that defendant made at the house "were not subject to any kind of coercion or promises[,]" and the court admitted those statements "up to the invocation of rights * * *." The trial court then stated:

"And then later on there's the conversation that I guess I need to address that occurred behind the trunk. I'm not convinced or persuaded that that conversation was for the defendant's benefit. That was a private conversation, from the way I understood the testimony. The defendant happened to overhear it. The windows were up. He's in the backseat. They're in the trunk. And the conversation is an expression of some surprise on the part of the detectives that the defendant didn't admit to something that seemed to them was obviously going to be proven.

"The defendant may have overheard it and taken it for much more than it really was and added his own kind of color to what it meant to him in context of other conversations and created this impression in his own mind. That may or may not be true. I don't find the defendant to be particularly credible.

"But in any event, the defendant then initiated freely, voluntarily and intelligently a conversation with the police officers, and in that conversation was reminded of his *Miranda* warning. There was a lengthy discussion regarding the fact that he had previously invoked his right to a lawyer. He clearly then waived his *Miranda* rights and Fifth Amendment rights and gave a free, voluntary statement to the police."

## III. ANALYSIS

On appeal, defendant assigns error to the trial court's denial of his motion to suppress. He argues that the detectives violated his right to remain silent and right to counsel under Article I, section 12, and the Fifth Amendment when they failed to cease questioning him on the porch of his house and when they talked about defendant's case behind the car at the jail, and that those violations affected the validity of his subsequent waiver of his constitutional rights at the jail. [4] Defendant also argues that the statements that he made at the jail were based on an implied promise of leniency and therefore involuntary. We address each argument in turn.

### A. *Waiver by initiating contact*

We first consider whether defendant validly waived his rights at the jail. *See State v. Acremant*, 338 Or 302, 321-24, 108 P3d 1139, *cert den*, 546 US 864 (2005) (determining whether the defendant validly waived his right to counsel where the defendant claimed that the admission of his statements during his penalty trial violated his right against compelled self-incrimination and the right to counsel). To be valid under Article I, section 12, and the Fifth Amendment, "a waiver of the right to counsel must be knowing, intelligent, and voluntary under the totality of the circumstances." *Id.* at 321 (citing *State v. Joslin*, 332 Or 373, 386, 29 P3d 1112 (2001) (concluding that the defendant's waiver, "although voluntary, was not knowingly made and, therefore, was invalid" under Article I, section 12) and *Edwards v. Arizona*, 451 US 477, 482, 101 S Ct 1880, 68

---

[4] Defendant's argument is predicated upon the underlying contention that "the *Miranda* warnings that police did provide were in fact required to be provided." The state does not argue that *Miranda* warnings were not required on the porch of defendant's house and concedes that defendant unequivocally invoked the right to counsel on the porch of defendant's house. *See State v. Smith*, 310 Or 1, 7, 791 P2d 836 (1990) (*Miranda* warnings are required when a defendant is questioned in a setting that should be recognized as "compelling") (internal quotation marks omitted). Accordingly, we assume without deciding that defendant was in compelling circumstances on the porch of his house when he unequivocally invoked his constitutional rights. *See State v. Anderson*, 175 Or App 464, 470 n 2, 28 P3d 662 (2001) (assuming without deciding, based on state's concession, that defendant was in compelling circumstances or custody when questioned by police).

L Ed 2d 378 (1981) (applying the Fifth Amendment test)). When reviewing a defendant's claim regarding the validity of such a waiver, we are bound by a trial court's findings of historical facts, and we review a trial court's conclusions concerning the waiver for legal error. *Id.*

We begin by considering defendant's state constitutional claim. *See State v. Kennedy*, 295 Or 260, 262, 666 P2d 1316 (1983) (court considers and disposes of questions of state law before reaching federal law claims). As previously noted, Article I, section 12, requires the police to give a defendant who is in custody or in compelling circumstances *Miranda*-like warnings before questioning. *Moore*, 349 Or at 382 (so stating). Once a suspect asserts the right to counsel, "questioning not only 'should' but must cease." *State v. Isom*, 306 Or 587, 593, 761 P2d 524 (1988). After a suspect has asserted the right to counsel, however, "the suspect remains free to waive that right by initiating further contact with the police." *Acremant*, 338 Or at 322 (citing *State v. Kell*, 303 Or 89, 95-100, 734 P2d 334 (1987)).

In this case, the trial court made findings and conclusions that are relevant to our analysis of the waiver issue. First, the trial court concluded that defendant asserted the right to counsel on the porch of defendant's house when defendant stated, "I would like to have an attorney or something here present." Second, the trial court concluded that the conversation at that point should have stopped, but found that there "were some questions that followed after that." Third, the trial court concluded that the detectives did not violate defendant's constitutional rights when they talked about the case behind the car at the jail, finding as fact that the detectives had engaged in a "private conversation" that was not undertaken "for the defendant's benefit." In addressing defendant's "impression" of that conversation, the trial court stated, "I don't find the defendant to be particularly credible." The trial court did not err.

First, taken in context, the statement that defendant made on the porch of his house that he "would like to have an attorney or something here present" is an unequivocal invocation of the right to counsel because it expressed defendant's desire to consult with an attorney before continuing

to speak to the detectives. *See Acremant*, 338 Or at 322 (concluding that the defendant unequivocally invoked his right to counsel by stating, "I think that I do need a lawyer. I do.").

Second, the detectives violated defendant's rights on the porch of his house when they failed to cease questioning him after his unequivocal invocation of rights. Although the detectives appeared to recognize that defendant had invoked his right to counsel by making that statement, the detectives nevertheless continued to probe defendant for information, saying that they knew "89 percent of what there [was] to know about the case"; that they did not "even really need" defendant's statement but that "in fairness" to defendant, defendant had "the right to tell [the detectives his] side"; that defendant could "stick with" his earlier statements regarding W and they would give defendant "a few more seconds to digest that"; and that they would give defendant, who asked if his parole officer knew about the allegation, a "[l]ast chance" to add anything. Although that continued questioning violated the "flat rule" requiring law enforcement officers to cease questioning upon request for counsel, *Isom*, 306 Or at 593, we note that defendant made no incriminating statements in response to that impermissible questioning.

Third, the detectives did not violate defendant's rights when they talked about the case behind the car at the jail; in light of the trial court's factual findings, the detectives' conversation did not amount to interrogation. The definition of interrogation extends "only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 US 291, 301-02, 100 S Ct 1682, 64 L Ed 2d 297 (1980) (emphasis in original); *see State v. Bradbury*, 80 Or App 613, 616 n 1, 723 P2d 1051, *rev den*, 302 Or 342 (1986) (adopting *Innis*'s definition of interrogation for the purposes of Article I, section 12). Here, the trial court found that defendant "happened to overhear" a "private conversation" that was not undertaken for defendant's benefit—that is, was not made with the intent to elicit an incriminating response. We are bound by that finding because it is supported by sufficient evidence in the record. *Ehly*, 317 Or at 75. Hockin testified that he did not think that defendant

could hear the conversation and that he did not intend for defendant to hear the conversation. *See Innis*, 446 US at 301-02 n 7 (noting that the intent of the police is not irrelevant because, "where a police practice is designed to elicit an incriminating response from the accused, it is unlikely that the practice will not also be one which the police should have known was reasonably likely to have that effect"). Further, based on Hockin's testimony, it appears that the detectives' conversation was very brief. Under those circumstances, we conclude that there is no evidence that the detectives should have been aware of the fact that defendant was able to overhear them. *See id.* at 303 ("Given the fact that the [officers'] entire conversation appears to have consisted of no more than a few offhand remarks, we cannot say that the officers should have known that it was reasonably likely that Innis would so respond.").

Nevertheless, because the detectives violated defendant's rights when they failed to cease questioning defendant on the porch of his house after his unequivocal invocation of rights, we must determine whether that violation affected the validity of defendant's subsequent waiver of those rights at the jail. Defendant cites *State v. Hall*, 339 Or 7, 115 P3d 908 (2005), to support his argument that his statements at the jail should have been suppressed. In *Hall*, the Oregon Supreme Court set forth the analytical methodology to determine whether evidence is inadmissible under Article I, section 9, of the Oregon Constitution because it was "obtained after unlawful police conduct or because it would not have been obtained 'but for' unlawful police conduct." *Id.* at 25. Under *Hall*, if a defendant can prove the existence of a minimal factual nexus between the evidence sought to be suppressed and prior unlawful police conduct, the burden shifts to the state to show that that evidence "did not derive from the preceding illegality." *Id.*

We reject defendant's argument because it is based on an incorrect understanding of the law. As the Oregon Supreme Court has explained, "The *Hall* methodology applies to violations of Article I, section 9. It does not apply to violations of Article I, section 12." *State v. Jarnagin*, 351 Or 703, 717 n 9, 277 P3d 535 (2012). Accordingly, we do not apply the *Hall* methodology to the facts of this case.

Rather than applying *Hall*, we apply *Acremant*, a case in which the Oregon Supreme Court held, on facts that are similar to those presented in this case, that the trial court's admission of the defendant's statements was not error. 338 Or at 302. In *Acremant*, the defendant, while being interviewed by the police, initially made no incriminating statements and invoked his right to counsel by saying, "I think that I do need a lawyer. I do." *Id.* at 318. The detectives then said that they would end the interview if the defendant wished to see a lawyer, but continued to speak with the defendant for approximately 13 more minutes, stating "that they were 'disappointed' that defendant had elected to terminate the interview, that they were interested in hearing defendant's side of the story, and that they were curious about defendant's motive * * *." *Id.* The detectives also told the defendant, "[I]f you change your mind and would like to talk to us, you can do so" and finally stated, "Wish you luck, bud. I think we'll be seeing you again, all right." *Id.* at 319. After being left alone for approximately one hour, the defendant asked to speak to the detectives, was again read *Miranda* warnings, and made incriminating statements to two different detectives. *Id.*

The Oregon Supreme Court considered whether, given an intervening violation of the right to counsel, the defendant nonetheless had made a valid waiver of his rights under Article I, section 12, and the Fifth Amendment. In its Article I, section 12, analysis, the court determined that the detectives unlawfully continued the first interview when they failed to cease the interrogation after the defendant unequivocally invoked his right to counsel. The court then noted that the police left the defendant alone after the termination of the first interview; that the defendant reinitiated contact with the police after having no contact for an hour; that the detectives ensured that the defendant understood his constitutional rights before beginning the second interview; and that the defendant confirmed that he understood his rights before making any inculpatory statements. *Id.* at 323. Accordingly, the court concluded that the detectives' unlawful conduct did not induce the defendant's subsequent statements and that the defendant knowingly and voluntarily waived his right to counsel under Article I, section 12. *Id.* at 323-24.

Looking to *Acremant*, we conclude that the detectives' unlawful failure to cease questioning defendant on the porch of his house after his invocation of rights did not induce defendant's confession at the jail. First, similar to the defendant in *Acremant*, defendant here initiated contact with the detectives after an extended break in questioning; defendant was not questioned during the 40-minute transport and was not interviewed at the jail until 8:00 p.m., more than an hour after the first interview concluded. Second, like the detectives in *Acremant*, Hockin and Lee ensured that defendant understood his rights under Article I, section 12, before beginning the second interview; indeed, after reading defendant *Miranda* warnings, Hockin underscored defendant's rights in three different ways: (1) Hockin told defendant, "You still have a right to an attorney. Just because you're—you mentioned one earlier, we terminated the interview, and now you're saying you want to talk. You can talk, but you can also talk with an attorney"; (2) Regarding the decision whether to talk, Hockin told defendant, "It's completely up to you"; and (3) Hockin told defendant that the second interview was "different" and ensured that defendant understood the "importance" of going through the *Miranda* warnings. Third, like the defendant in *Acremant*, defendant here confirmed that he understood his rights before making any incriminating statements. Specifically, at the beginning of the second interview, Hockin asked defendant, "Do you understand your *Miranda* rights?" and defendant replied, "Yeah." Hockin also asked defendant, "Do you understand why we're going through all this?" and defendant replied, "Yeah."

We next consider whether defendant made a valid waiver of his right to counsel under the Fifth Amendment. The United States Supreme Court has stated, "*Miranda* itself indicated that the assertion of the right to counsel was a significant event and that once exercised by the accused, 'the interrogation must cease until an attorney is present.'" *Edwards*, 451 US at 485 (citing *Miranda*, 384 US at 474). The Court has also held that, after initially being advised of the right to counsel, the accused may validly waive that right and respond to interrogation, but only by initiating "further communication, exchanges, or conversations with

the police." *Id.* at 484-85. After noting *Edwards* in *Acremant,* the Oregon Supreme Court stated that the defendant "did not make any inculpatory statements in response to [the detectives'] probing after he had invoked his right to counsel" and that the defendant had initiated the second interview. 338 Or at 323. Accordingly, in *Acremant,* the court concluded that the defendant made a knowing and voluntary waiver of his right to counsel under the Fifth Amendment. *Id.*

Guided by *Acremant,* we conclude that defendant in this case knowingly, intelligently, and voluntarily waived his right to counsel under the Fifth Amendment. Like the defendant in *Acremant,* defendant here did not make any incriminating statements in response to the unlawful police prompting on the porch of defendant's house. Furthermore, like the defendant in *Acremant,* defendant here later initiated further contact with the detectives in the jail after an extended break, asking, "Can we talk?"

In sum, we conclude that the trial court did not err when it rejected defendant's argument that his statements were tainted by constitutional violations and were therefore inadmissible. Although the detectives violated defendant's rights when they failed to cease questioning him on the porch of his house after defendant unequivocally invoked his right to counsel, the detectives' failure to cease questioning defendant on the porch did not induce defendant to later confess at the jail.

## B. *Promise of leniency*

We now consider whether the statements that defendant made at the jail were inadmissible because they were made in response to an implied promise of leniency and therefore involuntary. When reviewing the voluntariness of a defendant's statements, we are bound by the trial court's findings of historical fact, but we independently assess the ultimate determination of voluntariness. *Id.* at 324; *see also State v. Tanner,* 236 Or App 423, 431, 236 P3d 775 (2010) (citing *Acremant* and setting forth that standard of review when determining whether the defendant's statements were voluntary under Article I, section 12).

The test for voluntariness under both Article I, section 12, and the Fifth Amendment is "whether, under the totality of the circumstances, it is apparent that the 'defendant's will was not overborne and his capacity for self-determination was not critically impaired.'" *Acremant*, 338 Or at 324 (quoting *State v. Vu*, 307 Or 419, 425, 770 P2d 577 (1989) and citing *Schneckloth v. Bustamonte*, 412 US 218, 93 S Ct 2041, 36 L Ed 2d 854 (1973) (Fifth Amendment test)). As we have stated, "Such a promise need not be express. An implied promise of immunity from prosecution is sufficient to compel suppression of a confession[.]" *State v. Pollard*, 132 Or App 538, 544, 888 P2d 1054, *rev den*, 321 Or 138 (1995).

As noted, the trial court first found that the statements that defendant made on the porch of his house "were not subject to any kind of coercion or promises." The trial court further found that the conversation that occurred between the detectives behind the car at the jail was not undertaken for defendant's benefit, and that defendant, who "happened to overhear" the conversation, took it "for much more than it really was and added his own kind of color to what it meant to him in context of other conversations and created [a wrong] impression in his own mind." However, the trial court immediately noted, "That may or may not be true. I don't find the defendant to be particularly credible." Finally, the trial court concluded that defendant "gave a free, voluntary statement to the police."

In light of the trial court's factual findings, which are supported by evidence in the record, we agree with the trial court's conclusion and reject defendant's argument that his statements were involuntary. *See Acremant*, 338 Or at 324 (rejecting the defendant's involuntariness claim where the "facts [were] insufficient to provide the basis for the conclusion that defendant's statements were involuntary"). At the conclusion of the interview that occurred at the jail, Lee asked if the detectives had made any promises or offer of a special deal, and defendant replied, "Huh-uh (negative response). No." Hockin testified that neither he nor Lee had made defendant any promises. Although defendant argues that the detectives offered him a "free chance" and said that things "would have been so much easier" for him if he had "just confessed back at the house," leading defendant to

believe that he would obtain a lenient sentence in exchange for his confession, the trial court did not find defendant credible. We conclude that the trial court did not err in determining that defendant's statements were voluntary—that under the totality of the circumstances, defendant's will was not overborne and his capacity for self-determination was not critically impaired.

## IV. CONCLUSION

In sum, the trial court did not err when it denied defendant's motion to suppress the statements that defendant made at the jail. We conclude that, despite the violation of defendant's rights under Article I, section 12, and the Fifth Amendment that occurred when the detectives failed to cease questioning defendant on the porch of defendant's house after defendant had invoked his right to counsel, defendant, at the jail, knowingly, intelligently, and voluntarily waived those rights. We also conclude that defendant's statements were not made in response to an implied promise of leniency and were not involuntary but were made voluntarily.

Affirmed.