Argued and submitted November 2, 2021, resubmitted January 25; order of Court of Appeals reversed, and case remanded to Court of Appeals for further proceedings April 21, 2022

STATE OF OREGON,
*Respondent on Review,*

*v.*

MICHAEL DAVID JACKSON,
*Petitioner on Review.*

(CC 18CR24467) (CA A170564) (SC S068428)

508 P3d 457

Defendant was charged with offenses stemming from an encounter with police officers in an ATM vestibule. Defendant moved that evidence arising from the encounter be suppressed, arguing that he was unlawfully seized. The trial court denied the motion based on a record that included surveillance footage depicting defendant's encounter with police. Defendant appealed and learned that the surveillance video had been lost or destroyed through no fault of defendant. He filed a motion in the Court of Appeals for reversal and a new trial under ORS 19.420(3). The Court of Appeals denied the motion by order, concluding that the missing video was not "necessary to the prosecution of the appeal" as required by statute because the trial court's factual findings were binding on appeal. *Held*: (1) A lost record is "necessary to the prosecution of the appeal" under ORS 19.420(3) when it is practically necessary to the prosecution of the appeal, including the presentation of the issues on appeal and the court's resolution of those issues; and (2) the Court of Appeals erred in concluding that the missing exhibit was not "necessary to the prosecution of the appeal" before considering the merits of the appeal.

The order of the Court of Appeals is reversed, and the case is remanded to that court for further proceedings.

On review of an order of the Court of Appeals.*

Mark Kimbrell, Deputy Public Defender, Office of Public Defense Services, Salem, argued the cause and filed the briefs for petitioner on review. Also on the briefs was Ernest G. Lannet, Chief Defender.

Robert M. Wilsey, Assistant Attorney General, Salem, argued the cause and filed the brief for respondent on review. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

_____

* On appeal of an order denying reconsideration.

Before Walters, Chief Justice, and Balmer, Flynn, Duncan, Nelson, Garrett, and DeHoog, Justices.**

WALTERS, C. J.

The order of the Court of Appeals is reversed, and the case is remanded to the Court of Appeals for further proceedings.

_____

** Nakamoto, J., retired December 31, 2021, and did not participate in the decision of this case.

**WALTERS, C. J.**

ORS 19.420(3), the lost record statute, provides that, when "an appeal cannot be prosecuted" by reason of the loss or destruction of an exhibit or "other matter necessary to the prosecution of the appeal" a reviewing court has discretion to order reversal and remand for a new trial "as justice may require." In this case, defendant was charged with and convicted of offenses that occurred during an encounter with police officers in an enclosed ATM vestibule. A surveillance video recorded the encounter and was admitted at trial as Exhibit 15. After the trial court entered the judgment of conviction, Exhibit 15 was lost or destroyed, and, in conjunction with his appeal to the Court of Appeals, defendant filed a motion seeking reversal and remand under ORS 19.420(3). The Appellate Commissioner denied defendant's motion, concluding, as a matter of law, that the lost exhibit was not "necessary to the prosecution of the appeal." The Court of Appeals denied reconsideration, and, because this court allowed defendant's petition for review, is holding defendant's appeal in abeyance. For the reasons that follow, we conclude that the Court of Appeals erred in summarily denying defendant's motion before more fully analyzing the issues defendant raised on appeal and considering whether Exhibit 15 was necessary to resolve those issues. We remand this case to the Court of Appeals to undertake that analysis.

## I.   FACTUAL BACKGROUND

Because the underlying appellate challenge is to a renewed motion to suppress, we recite the undisputed evidence that was available at the time of the motion's renewal. Shortly after midnight on Tuesday, April 3, 2018, Bend Police Officer Charles was uniformed and on patrol in his squad car. As he was driving, he noticed two men, defendant and another man, Michael, standing inside the lighted ATM vestibule of the Wells Fargo bank. The vestibule is six to eight feet square and its double doors are made of clear glass, making patrons in the vestibule readily visible from the street. During business hours, the vestibule's doors are unlocked, and a customer may walk from the street through its doors and then, to access banking services further inside the building, through a second set of doors. At night, when

the bank is closed and locked, the vestibule also is locked, but a customer can enter it by unlocking its doors with an ATM card.

When Charles saw the two men in the vestibule, defendant was near the ATM, Michael was facing away from the door, and belongings were strewn on a countertop. Charles had not received a call raising concerns about the men or the vestibule, but he thought that the men's presence, late at night and mid-week with strewn belongings, was suspicious and that one of the men might be robbing the other. Charles parked his squad car, got out, and, undetected by the men, listened to their conversation from outside the vestibule for two to five minutes. The men were playing music and "just kind of carrying on with each other." Charles's concern that a robbery could be in progress was allayed, but he then suspected that the men were committing a "trespassing offense" because they were not "conducting any business" in the vestibule and it was midnight.

Charles approached the glass doors and found them locked, raising a concern that the men may have locked the vestibule doors behind them, preventing others from entering.[1] Charles knocked, identified himself as a police officer, explained his concerns, and asked to see the men's identifications. Michael opened the door and presented an Oregon ID.

Throughout the conversation, Charles stood in the doorway to the vestibule. His chest faced the men, and his foot and arm were on one of the doors, holding it open. The wall was to his right and the second door was closed. Defendant did not initially respond to Charles's request for identification. Charles said, "I'm not trying to give you a hard time. I just would like to know who you are so I can figure out exactly what's going on." Defendant initially refused the request, telling Charles that Charles "was harassing him." Eventually, defendant displayed a debit card and then, while covering some of the relevant information such that Charles could not read it, what appeared to be a Washington ID.

---

[1] At trial, Charles offered conflicting testimony about whether, at the time that he encountered defendant in the vestibule, he was aware that a customer could unlock the vestibule doors with an ATM card.

Charles told defendant that it was "odd, that it's about midnight on a Tuesday" and defendant was "inside of a foyer at the bank with another male apparently not conducting any business from [Charles's] perspective." Defendant then dialed 9-1-1 on his cellphone. At some point, Charles allowed Michael to leave the vestibule, but Charles could not recall whether that was before or after defendant called 9-1-1.

Defendant told the 9-1-1 dispatcher that there was a "police emergency," that he was being harassed by the Bend City Police Department, and that he needed a state trooper. Defendant never identified himself to the dispatcher. The dispatcher asked about the officer who was holding the door open and defendant replied:

> "I don't know who he is. I have no idea. He didn't show me any I.D. He didn't show me anything. He just wants to see some I.D. I have no idea who he is. I'm in my bank, trying to get cash out of my cash machine, and this guy—I don't know who he is. I have no idea."

Defendant then set the phone down but did not end the call. Charles contacted dispatch, confirmed that defendant had called 9-1-1, and called for backup.

Charles now believed that he had witnessed defendant commit a crime, "[m]isuse of 9-1-1," because defendant had "contacted 9-1-1 for what was not an emergency to make a complaint against an officer who was investigating a crime at the time. There was no emergency. He stated that [the officer] did not identify [himself], which was clearly not true."

A second police officer, Officer Goller, arrived at the bank. Goller saw Charles outside the door, holding the right door open, and "contacting" defendant. Michael had already been told he was free to go. Goller asked defendant for identification, and defendant refused, setting his wallet and ID down on the countertop.

The officers told defendant that he was under arrest for misuse of 9-1-1 and to put his hands behind his back. Defendant refused. Goller grabbed defendant's right arm and Charles grabbed his left, attempting to force them

behind his back. Defendant tensed and pulled his arms away. The officers ordered defendant to stop tensing, and defendant said "I'm not" while continuing to tense his muscles. Considering both "the confined space" and the safety of defendant and the officers, Charles pressed defendant's head against the ATM to handcuff him. Defendant did not allow himself to be handcuffed, and the officers forced him to the ground, determining that, given the confined space, it was safer to bring him to the ground than to have him standing. The officers noted that they had no "avenue of escape" if they lost their grip on defendant, and they did not know whether he was armed. Eventually, the officers handcuffed defendant and arrested him.

The state charged defendant with resisting arrest (ORS 162.315) and improper use of emergency communications system (ORS 165.570). The parties learned that a surveillance camera had captured the encounter, but Wells Fargo refused to produce the resulting video before trial, and the trial court denied defendant's pretrial request for a continuance to give defense counsel more time to review the video ahead of trial.

On the day of trial, but before *voir dire*, defendant made two pretrial motions, one renewing a motion to continue so counsel could view the video before trial and the other to suppress all evidence arising from defendant's "unlawful arrest." Defendant argued that he had been "unlawfully seized at the time that this incident occurred[, and] [a]ll interactions from the point after the unlawful seizure would be fruit of the poisonous tree and * * * therefore, should be properly suppressed." The state objected to the motion to suppress, arguing that it was untimely and did not provide the state with sufficient notice to respond. The trial court denied both motions.

At trial, the state offered, as part of its case in chief, Exhibit 15, the surveillance video of the ATM vestibule. Defendant did not object, and the trial court admitted the exhibit. According to the trial transcript, the silent footage on the video is about 29 minutes long, and the first 14 minutes depict defendant and Michael in the vestibule before Charles arrived. The remaining minutes show the

interaction between the police officers and the two men in the vestibule, including defendant's arrest. The state showed the video to the jury during Charles's testimony, and he provided commentary. Charles testified that when defendant dialed 9-1-1, Charles stood "outside the doorway, holding the door open." He testified that there were some aspects of the encounter that the video did not capture and that it sometimes skipped a few seconds ahead, but overall it "represent[ed] a fair and accurate depiction of the interactions with [defendant] that night."

After the state rested its case, defendant renewed his motion to suppress. Defendant argued:

> "And it's clear, after testimony from the officers, that [defendant]'s constitutional rights were violated. [Defendant] was unconstitutionally seized.
>
> "Officer Charles has testified that, at the time that he asked for identification, he was blocking the doorway. It's been made very clear that there was no available means for exit, and Mr.—or Officer Charles's testimony that he changed his reason for the stop from a suspected robbery to a suspected Criminal Trespass lacks sufficient facts that an officer could believe that Criminal Trespass was being committed.
>
> "He clarified his testimony that he was aware at the time that it required an ATM card to get into the foyer and that he had received no calls or requests for a Criminal Trespass at that time."

The state responded that Charles had reasonable suspicion that defendant was committing criminal trespass or, in the alternative, that Charles had not stopped defendant because he had not blocked defendant from leaving the vestibule; Charles had only asked defendant for his identification.

In ruling on those intertwined issues, the trial court made findings of fact and reached conclusions of law that were limited to the following:

> "After standing outside of the vestibule listening, the officer determined that the circumstances did not necessarily

suggest any kind of robbery, but given the hour, given the fact that they were not engaged in any banking business and appeared to be having some kind of leisurely conversation with objects strewn about in the vestibule, he believed that a criminal trespass was in progress.

"He opened the door after the other occupant—not the defendant—made some statement about the police being there. Attempted to ask for identification from the individuals, defendant and the other occupant. The door was open. The officer was standing outside of the door or at the door, holding the door open. That's what his testimony was that was consistent with the video evidence that was received.

"Defendant did not make any attempt or request to leave. The officer, nevertheless, would have had the authority to detain the defendant for reasonable suspicion of criminal activity; in particular, Criminal Trespass which the officer believed may be in progress and subjectively believed was in progress."

The trial court denied defendant's motion and submitted the case to the jury, which found defendant guilty as charged.

Defendant appealed, and appellate counsel learned that Exhibit 15 had been lost through no fault of defendant. Counsel was unable to recover the footage or find a replacement, and he filed a motion under ORS 19.420(3) asking that the Court of Appeals reverse and remand for a new trial and arguing that the "issue of whether a stop occurred is directly impacted by the missing exhibit." The Appellate Commissioner denied defendant's motion, concluding, by order and as a matter of law, that the footage was not "necessary to the prosecution of the appeal." The commissioner explained her ruling as compelled by the appellate court's standard of review: "The trial court's findings of fact are binding on appeal, given that they are based on and supported by testimony in the record." Defendant moved for reconsideration by the court, and, by order, the Court of Appeals upheld the ruling of the Appellate Commissioner. ORAP 7.55(4)(a). Defendant filed a petition for review of that order, which we allowed. While we conduct that review, the Court of Appeals is holding defendant's appeal in abeyance.

## II.   LEGAL BACKGROUND

The legal question for resolution in this court is whether the Court of Appeals was correct in denying defendant's lost record motion as a matter of law, because, as the Court of Appeals reasoned, Exhibit 15 is not "necessary to the prosecution of the appeal." Resolution of that legal question requires that we interpret that phrase in the lost record statute, ORS 19.420(3), which provides:

> "Whenever it appears that an appeal cannot be prosecuted, by reason of the loss or destruction, through no fault of the appellant, of the reporter's notes or audio records, or of the exhibits or other matter *necessary to the prosecution of the appeal*, the judgment appealed from may be reversed and a new trial ordered as justice may require."

(Emphasis added.)

This court has meaningfully considered that statute four times, focusing in all instances on whether to exercise or whether the Court of Appeals correctly exercised discretion to grant a new trial. Although that is not the issue before us in this case, it is helpful to summarize our earlier cases to illustrate the circumstances in which lost records issues arise.

This court first considered the lost record statute in 1948 in the defendants' appeal to this court from a trial court decree in a constructive trust suit. *Hoffart v. Lindquist & Paget Mortg. Co.*, 182 Or 611, 613-14, 189 P2d 592 (1948). In *Hoffart*, the court stenographer's shorthand notes and the admitted exhibits had been lost through no fault of the defendants, and they asserted that that innocent loss was all that was needed to justify reversal and a new trial. *Id.* at 614-15. This court disagreed, explaining that a party invoking the statute must take two additional steps that the defendants had not taken: The party must show that it had made an attempt to recreate the lost record and must assert not only that records had been lost, but also that some legal error or injustice had occurred. *Id.* at 616-17.

This court next addressed the lost record statute in *Ethyl Corp. v. Jalbert*, 270 Or 651, 654, 529 P2d 368 (1974), again on direct appeal from a trial court judgment. That

case had gone to the jury for deliberations, and, in response to a question from the jury, the trial court had repeated an instruction that it, without objection, had given earlier. *Id.* at 653. The appellant assigned the re-instruction as error on appeal, but the record did not disclose what question the jury had raised, the colloquy about that question, or which instruction the court repeated. *Id.* at 654. This court denied the appellant's motion to reverse the judgment, relying on the appellant's failure to show that it could not recreate the missing information and its failure to provide any basis for thinking that the trial court had abused its discretion in re-instructing the jury. *Id.* at 655-56.

The third case came to this court on review of a decision by the Court of Appeals granting the plaintiff's motion to reverse the trial court judgment because the audio record of the trial had been destroyed. *Smith v. Custom Micro, Inc.*, 311 Or 375, 377, 811 P2d 1371 (1991). This court held that the Court of Appeals had erred in that "summary" determination because, although the parties did not dispute that the record was "necessary" to the prosecution of the appeal, the plaintiff had not yet done enough to demonstrate that an error had occurred. *Id.* at 377-79. All the plaintiff had done was to "hint darkly at errors in refusing him a postponement, in not granting him a jury trial, and in making various rulings (which plaintiff acknowledges were discretionary but which he insists would be shown by a complete record to have been abuses of that discretion)." *Id.* at 379 (footnote omitted). Although we concluded that the Court of Appeals had erred in granting the plaintiff's motion at that stage in the appeal, *id.* at 380, we left open the question of whether that court should, in the exercise of its discretion, permit the plaintiff a further opportunity to make the required demonstration of error. *Id.* at 380 n 6.

The final case in which this court considered the lost record statute is *State v. Acremant*, 338 Or 302, 338, 108 P3d 1139 (2005), a case that came directly to this court on mandatory review of a trial court's sentence of death. Ninety minutes of the record of the defendant's penalty trial had been inadvertently erased, and, to indicate what had occurred during that time, the state had supplemented the

record with logs and affidavits, including an affidavit from the trial court reporter. *Id.* at 331-32. The defendant argued that that reconstruction did not eliminate the problem; that it was incomplete and contained inconsistencies that precluded counsel and the court from identifying possible errors. *Id.* at 339. The court began its analysis by naming two "statutory prerequisites" to review—that "a record or exhibit necessary to the prosecution of an appeal is destroyed and that destruction occurred through no fault of the appellant"—and saying that "there is no dispute" that both "are met." *Id.* at 338. The court then proceeded to the discretionary step in the analysis and declined to order the relief requested. The court said that the defendant had not alleged that the supplemental record was not an accurate representation of what had occurred and had "fail[ed] to make a persuasive argument that the missing transcript [would] *prevent review by this court* of any error or miscarriage of justice that actually occurred." *Id.* at 339 (emphasis added).

This case does not suffer from the faults identified in a number of those cases. Here, the state does not question defendant's due diligence in attempting to find or reproduce the surveillance tape, Exhibit 15. And defendant describes both the trial court's alleged error and how Exhibit 15 would support his claim of error with specificity. This case also does not require that we exercise our discretion to grant defendant's lost record motion or review an exercise of discretion by the Court of Appeals. The Court of Appeals rejected defendant's motion as a matter of law before considering the merits of his appeal, and, therefore, the question before us is a novel one that requires that we interpret ORS 19.420(3), and the phrase "necessary to the prosecution of the appeal," a task to which we now turn.

### III.   STATUTORY INTERPRETATION

Defendant would have us broadly interpret the subject phrase as providing that a record is necessary to the prosecution of the appeal "if it is required for appellate counsel to competently perform his or her function—fully examine the proceedings and record below, identify issues and claims of error to present to the appellate courts, and assure meaningful review by those courts." To reach that result,

defendant focuses on the phrase "prosecution of the appeal" rather than the term "necessary." In defendant's view, the phrase "prosecute an appeal" is a term of art, which imports all the ethical and constitutional requirements that would bind a person who undertakes the task of prosecuting a criminal appeal. Defendant contends that, particularly in a criminal appeal where a defendant's constitutional rights may be implicated, competent representation requires extensive preparation and a thorough review of the record, and lost records may interfere with counsel's ability to meet those obligations. Defendant also suggests that relief under the lost record statute should not depend on a stringent showing of necessity, but should be freely allowed when a court believes, in the exercise of its discretion, that justice requires a new trial.

The state advocates for an interpretation of the subject phrase that is much stricter than defendant's interpretation. The state would have us hold that a record is "necessary to the prosecution of the appeal" only when its absence entirely precludes appellate review. The state emphasizes that the statutory remedy is extraordinary and argues that it should be available only in the limited circumstance in which a lost record is the only contemporaneous record of the proceeding at issue, and the appeal cannot proceed without it.

We begin with the meaning of the term "necessary," as it is used in ORS 19.420(3). That term is not defined in the statute, and we have no reason to think that the legislature intended that it have anything other than its ordinary meaning. *See PGE v. Bureau of Labor and Industries*, 317 Or 606, 611, 859 P2d 1143 (1993) (holding that in construing a statute, a court assumes that the legislature generally uses words in their "plain, natural, and ordinary" manner). We discern that meaning by looking to the dictionary definition of the term in 1947, when the legislature first used it in the lost record statute.[2] *Webster's Second New Int'l Dictionary* 1635 (unabridged ed 1935) defines "necessary" as follows:

---

[2] As originally enacted, the statute read, in relevant part:

"whenever it appears that such appeal can not be prosecuted by reason of the loss or destruction, through no fault of the appellant, of the reporter's short-hand notes, or of the exhibits, or other matter necessary to the prosecution of

"**1.** Essential to a desirable or projected end or condition; not to be dispensed with without loss, damage, inefficiency, or the like \*\*\* **2.** Resulting from or happening in accordance with necessity; determined by the nature of things; predestined or obedient to natural law \*\*\* **3.** Having the character of being compelled or resulting from compulsion; not voluntary \*\*\* **7.** *Logic.* **a.** Logically required or unavoidable \*\*\* **b.** Impossible of denial without contradiction; a priori \*\*\*."

Both parties can find support for their arguments in that definition. By including matters that cannot be "dispensed with without loss, damage, inefficiency, or the like," the definition captures matters that are essential as a practical matter but are not logically required in the sense that, without them, the appeal would be procedurally impossible. However, because the definition does include matters that are "logically required or unavoidable," the legislature could have used the word "necessary" in that more limited sense. We cannot answer the question before us by looking solely to the dictionary definitions of the word "necessary."

Turning, then, to the remaining words in the subject phrase and its statutory context, we see several indications that the legislature did not intend to require the procedural impossibility for which the state argues. Taken to the extreme, a procedural impossibility would require a showing of inability to commence an appeal. That stringent view is inconsistent with two aspects of the statute. First, as defendant argues, the word "necessary," is part of a longer phrase—"necessary to the prosecution of the appeal." Thus, the legislature did not intend that an appellate court look only to the significance of a lost record in commencing an appeal. "To 'prosecute' an action is not merely to commence it, but includes following it to an ultimate conclusion." *Black's Law Dictionary*, 1450 (3d ed 1933). Second, the statute permits a court to act when the record that is lost is an exhibit, and a party need not produce an exhibit to commence an appeal. Even if procedural necessity is not limited to the

the appeal, the judgment or decree appealed from may be reversed and a new trial ordered as justice may require."

Or Laws 1947, ch 192.

commencement of an appeal, however, the broader context in which the phrase is used indicates that the legislature did not intend "necessity" to have the narrow meaning for which the state argues. ORS 19.420(3) permits a court discretion to order a new trial "as justice may require." If the legislature intended to limit the statute's reach to instances of procedural impossibility, that impossibility alone would typically compel a remedy. There would be little room for discretion and a consideration of what "justice may require." We think it more likely that the legislature intended to grant an appellate court broad authority to exercise its judgment when, in its view, a lost exhibit is practically necessary to the prosecution of an appeal.

In reaching that conclusion, we do not adopt defendant's interpretation of ORS 19.420(3), at least to the extent that he asserts that a lost record is "necessary" whenever the record would be useful to defense counsel in deciding whether to appeal. Even the most inclusive dictionary definition of "necessary" requires that the subject be "essential," or "not to be dispensed with without loss, damage, inefficiency, or the like," *Webster's* at 1635, which is more demanding than "useful." And to focus solely on counsel's need for the record would ignore the role of the court in determining whether the lost record is necessary "to *the prosecution* of the appeal." As noted, that phrase describes a process beyond commencement of the appeal. Although it is a party that prosecutes an appeal, the question of whether a lost record is necessary to "the prosecution," will not turn, solely, on what a party needs to raise an issue, if a court can resolve the appeal without addressing that issue.

That understanding is consistent with this court's analysis in *Acremant*, 338 Or at 339. There, as indicated, the necessity of the destroyed transcript was not in dispute, and the defendant argued that this court should exercise its discretion to order a new penalty phase trial because, without it, he and the court could not identify possible trial court errors. In declining that invitation, we said that the defendant had "fail[ed] to make a persuasive argument that the missing transcript [would] *prevent review by this court* of any error or miscarriage of justice that actually occurred."

*Id.* (emphasis added). Our description of the relevant discretionary inquiry in *Acremant* is consistent with our statutory interpretation here.

As a final step in our interpretation of ORS 19.420(3), we ordinarily would consider legislative history that bears on the meaning of the subject phrase. *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009). However, in this case, the parties have not pointed to, and we have not found, material guidance there. Thus, from the statute's text and context, we conclude that the phrase "necessary to the prosecution of the appeal" means that the lost record must be practically necessary for the prosecution of the appeal, including not only the commencement of the appeal, but also the presentation of the issues on appeal and the court's resolution of those issues. With that interpretation in hand, we turn to its application to the present case.

## IV.   APPLICATION

To determine whether the Court of Appeals erred in deciding that Exhibit 15 is not "necessary" to the prosecution of this appeal, we must first consider the issues on appeal in that court. On appeal to the Court of Appeals, defendant challenges the trial court's denial of his motion to suppress, arguing that he was unconstitutionally seized and that the evidence arising from the seizure must therefore be suppressed. To make that argument successfully, defendant will be required to establish (1) that he was seized, and (2) that the seizure was not supported by reasonable suspicion (and was thus unconstitutional). *See State v. Maciel-Figueroa*, 361 Or 163, 170, 389 P3d 1121 (2017) (undertaking that analysis). Defendant also likely will need to respond to the state's arguments that (1) defendant committed new crimes (calling 9-1-1 absent an emergency and resisting the officers' attempts to handcuff him) and that his doing so attenuated the taint of the seizure, and (2) that the error, if any, was harmless. *See State v. Suppah*, 358 Or 565, 577, 369 P3d 1108 (2016) (committing new crime in response to an unlawful seizure can attenuate taint of unlawful stop); *State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003) (requiring that appellate court uphold verdict if little likelihood that error affected it).

Defendant contends that Exhibit 15 is necessary to the court's consideration of the foundational first issue on appeal—whether defendant was seized. A seizure occurs when "a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives" an individual of her liberty or freedom of movement or if, under the totality of the circumstances, a reasonable person would believe her liberty was so restricted. *State v. Ashbaugh*, 349 Or 297, 316, 244 P3d 360 (2010). When an officer conveys to the defendant by word, action, or both that the defendant is not free to end the encounter, the officer seizes the defendant. *State v. Rodgers/Kirkeby*, 347 Or 610, 627, 227 P3d 695 (2010). An officer may convey that an individual is not free to leave by the physical position that the officer occupies. *See State v. Dominguez-Martinez*, 321 Or 206, 213, 895 P2d 306 (1995) (defendant was seized when an officer told him he was free to go but stood in the open doorway of defendant's car). In this case, defendant contends that Exhibit 15 could definitively establish that Charles took a position in the door to the vestibule that conveyed to defendant that he was not free to leave. Defendant claims that the video would show Charles's position, the position of defendant and his friend, and the size and figuration of the vestibule—information that is practically necessary to determine whether a seizure occurred.

The state contends that Exhibit 15 is not necessary to the resolution of that legal issue for two reasons. The first is the deferential standard of review on which the Court of Appeals relied, *viz.*, that "the trial court's findings of fact are binding on appeal, given that they are based on and supported by testimony in the record." The second is that the Court of Appeals could resolve the issues on appeal without deciding whether a seizure occurred, for instance by deciding that even if a seizure occurred, it was supported by reasonable suspicion, that the evidence to be suppressed was not tainted by the seizure, or that the error, if any, was harmless.

We will take the state's second argument first. We agree that once the Court of Appeals reaches the merits of defendant's appeal, it may proceed past the first door presented on appeal and take another door out. In other words,

the court may assume rather than decide that defendant was seized and may uphold defendant's conviction on some other legal basis, thereby making Exhibit 15 unnecessary to its determination. But the Court of Appeals has not yet taken up the merits of defendant's appeal, and we do not know how it will proceed when it does. The issue before us is not how the Court of Appeals could or should decide the merits of defendant's appeal, but whether the Court of Appeals erred by deciding, *before* beginning that analysis, that Exhibit 15 was not necessary to its review.[3]

The reason that the Court of Appeals gave for denying defendant's lost record motion was its understanding of the standard of review: that the trial court had made findings of fact that, if supported by constitutionally sufficient evidence in the record, could not be a basis for reversal. That is a correct statement of the law. *State v. Ehly*, 317 Or 66, 74-75, 854 P2d 421 (1993). That rule of law does not mean, however, that the Court of Appeals was correct in deciding that Exhibit 15 is unnecessary to the prosecution of the appeal. Before this court, defendant argues that, even recognizing that standard of review, there are two independent reasons that Exhibit 15 could be practically necessary to the court's analysis of the merits of his appeal. First, the Court of Appeals could decide that it needs to view Exhibit 15 to decide whether the trial court's findings are supported by constitutionally sufficient evidence. Second, the Court of Appeals could determine that Exhibit 15 is practically necessary even without disturbing supported and binding factual findings: The court must look to the totality of the circumstances to decide the legal question of whether defendant was seized and may consider Exhibit 15 necessary to its legal analysis.

In his first argument, defendant contends that video recordings are "uniquely powerful pieces of evidence"

---

[3] We do not mean to imply that an appellate court can never decide a motion under ORS 19.420(3) before reaching the merits of an appeal. There may well be instances in which an appellate court can determine whether a lost record is practically necessary to the prosecution before briefing. However, where, as here, practical necessity depends on an analysis of the issues presented on appeal, it may be error for the appellate court to decide a motion under ORS 19.420(3) before considering the merits of those issues.

because they create an "objective and irrefutable record" of what occurred. He takes the position that, in this case, the video could so severely undermine Charles's testimony that it renders that testimony constitutionally insufficient to support the trial court's factual findings. Defendant argues that, where a witness's testimony conflicts with an unaltered, clear video, and a trial court credits the testimony rather than the video, the trial court's findings are not supported by constitutionally sufficient evidence. *Cf. Scott v. Harris*, 550 US 372, 380-81, 127 S Ct 1769, 167 L Ed 2d 686 (2007) (Eleventh Circuit erred in relying on respondent's version of events on summary judgment because respondent's account was "utterly discredited" by video evidence; court ought to have "viewed the facts in the light depicted by the videotape").

The state responds that defendant's argument is both foreclosed by the standard of review and speculative. According to the state, defendant can establish only that the video *could show* that Charles seized defendant, and that is unlikely because the trial court found that Charles's testimony was consistent with the video, a finding to which defendant did not object. Also, the state urges, defendant did not rely on the video in making his renewed motion to suppress; he surely would have done so if the video clearly demonstrated that he was seized.

The parties' arguments raise intriguing, important, and complex questions about the weight that an appellate court must give to testimonial evidence or findings based on such evidence when the evidence or findings are controverted by other evidence, such as physical or recorded evidence, that is not beset by the limitations that accompany witness testimony.[4] In this case, those questions are even

---

[4] Defendant contends that witness testimony is beset with limitations: Memories fade and even alter with every retrieval. *See* Mark W. Bennett, *Unspringing the Witness Memory and Demeanor Trap: What Every Judge and Juror Needs to Know about Cognitive Psychology and Witness Credibility*, 64 Am U L Rev 1331, 1336 (2015) ("Our brains then either recreate or reconstruct our experiences rather than retrieve copies of them. However, in this process of recreating or reconstructing, we add on feelings, beliefs, or even knowledge we obtained after the experience. Thus, we bias our memories of the past by attributing to them emotions or knowledge we acquired after the event. Because memory is not like a video camera that can perfectly recall images of past events, it is

more complex because the video evidence is lost, and neither this court nor the Court of Appeals will be able to view it to determine the extent to which it undermines Charles's testimony and the trial court findings.

But, as it happens, we need not reach that question here. In our view, defendant's second, alternative argument for why Exhibit 15 could be necessary to the Court of Appeals' analysis is persuasive. As we will explain, that argument provides an independent basis for concluding that the Court of Appeals erred in denying defendant's lost record motion without proceeding to the merits of his appeal and considering it in that context.

Defendant's second argument is that, without undermining or contradicting Charles's testimony, the video will show that Charles impeded defendant's egress and thereby seized him. We understand defendant to assert that the events depicted in the video may both cohere with the trial court's factual findings *and* provide additional detail establishing the "totality of the circumstances" necessary to the court's legal conclusion.

To decide a motion to suppress and reach a legal conclusion about whether the defendant was unconstitutionally seized, a court must look to the "totality of the circumstances" and determine whether a reasonable person would have felt free to leave the encounter. *Ashbaugh*, 349 Or at 316. The totality of the circumstances is established not only by the trial court's findings of fact but also by undisputed facts in the record. *See Acremant*, 338 Or at 317 (looking to "undisputed facts relating to defendant's assignment of error * * * from the trial court's findings of fact and from the record" to evaluate whether the trial court erred on a motion to suppress).

Here, the existence of the surveillance video and what it revealed (*i.e.*, that it depicted the encounter including

---

fraught with potential mischief." (Internal quotations and citations omitted.)). Listeners also do not access the raw data that the witness did. Instead, the witness selects and interprets the data that the witness considers meaningful to offer a coherent account of "what happened." *Cf. State v. Lawson/James*, 352 Or 724, 771-72, 291 P3d 673 (2012) (discussing scientific literature on factors affecting a witness's perception of events in an appendix to the opinion).

body positioning) were undisputed. The state introduced the lost video in its case-in-chief, and Charles testified that the video was "a fair and accurate depiction of the interactions with [defendant] that night." The trial court found the video to be "consistent with" Charles's testimony about the open door and Charles's position "outside or at the door." Thus, if Exhibit 15 were not lost, the trial court's findings and the applicable standard of review would not preclude the Court of Appeals from considering it.

Accordingly, the Court of Appeals erred in deciding that the standard of review made Exhibit 15 unnecessary to its review. It did not. The standard of review did not preclude the Court of Appeals from deciding that Exhibit 15 was practically necessary to its review because the exhibit goes to the totality of the circumstances, which an appellate court is required to look at to decide the legal question of whether defendant was seized. That error requires that we reverse the order of the Court of Appeals denying defendant's motion for a new trial and return this case to that court. That court is holding defendant's appeal in abeyance, and, as it proceeds to analyze the merits, will want to consider whether Exhibit 15 is practically necessary to its resolution of the case and whether to exercise its discretion to order a new trial. *See, e.g.*, *State v. Shumate*, 262 Or App 109, 122-23, 330 P3d 29, *rev den*, 356 Or 397 (2014) (Court of Appeals considered defendant's lost record motion in context of its consideration of merits of defendant's appeal); *cf. Smith*, 311 Or at 380 & n 6 (Court of Appeals erred in granting motion for new trial based only on the loss of the record; whether Court of Appeals could reconsider issue in the context of considering merits of appeal left open).

It is not our role to try to predict the course that the Court of Appeals analysis will take. As discussed above, there are paths that the Court of Appeals could take that would eliminate its need to decide whether defendant was seized. And it also is possible that the Court of Appeals could agree with defendant on the seizure issue without viewing Exhibit 15. For instance, the Court of Appeals could decide, based only on the trial court findings and the evidence that is in the record, that Charles's position outside the door of the enclosed vestibule communicated to defendant that he

was not free to leave, and therefore that the trial court erred in denying defendant's motion to suppress.[5] *See Dominguez-Martinez*, 321 Or at 213 (the defendant was seized when an officer told him he was free to go but stood in the open door-way of the defendant's car). Either of those approaches would render Exhibit 15 unnecessary to that court's resolution of defendant's appeal. However, that court also could consider the existence of a seizure to be dispositive and could determine that, to decide that legal question, it is practically necessary to view the lost video. If the Court of Appeals were to reach that fork in the road, then that court would exercise its discretion and consider what "justice requires," including whether to reverse defendant's conviction and whether to order a new trial. On remand, the choices of path and the decisions along the way are for the Court of Appeals.

The order of the Court of Appeals is reversed, and the case is remanded to the Court of Appeals for further proceedings.

---

[5] We note that Charles told defendant's companion, but not defendant, that he could leave the vestibule, which he described as "confined" and "enclosed." Charles also testified that he and his fellow officer were worried because they had no means of escape, and the same might be said of defendant, who would have needed to get by Charles to leave the vestibule.